THE VILLAGE OF SCHAUMBURG, Plaintiff-Appellee, *v*. HAROLD P.
FRANBERG *et al.*, Defendants-Appellants.

First District (5th Division)    No. 79-2375

Opinion filed July 31, 1981.

2

John F. O'Meara, of Arlington Heights, for appellants.

Allen D. Choka and Jack M. Siegel, both of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Complaints were filed by plaintiff, the Village of Schaumburg (the Village) against defendants, taxicab drivers for Prospect Cab Company of the Village of Mount Prospect, Illinois, for having "no public passenger business license" in violation of section 30—2 of the Village's ordinance. The stipulated facts at the ensuing bench trial showed that defendants were charged with violating the aforementioned ordinance after a Village police officer observed them on three separate occasions picking up passengers at the Woodfield Shopping Center located in the Village of Schaumburg without the required license. Defendants appeal from the findings of guilt and the imposition of a fine of $25 and $10 court costs because of their failure to have licenses to pick up passengers within the limits of the Village in violation of the ordinance.

Before reaching the issues presented for review, we find it necessary to resolve the dispute beween the parties as to the exact stipulation of facts upon which defendants were tried. Defendants maintain that the stipulation included evidence that they picked up the passengers in the Village only after being solicited to do so, and that they returned the passengers to the Village of Mount Prospect, in which they were licensed. The Village argues that the only stipulated evidence was that defendants picked up passengers in the Village without the required license. The transcript of the proceedings reveals the following exchange between defense counsel, the Village prosecutor, and defendant Franberg:

"DEFENSE COUNSEL: Judge, this is a little conclusive. I don't think there is any question about the facts, there is no argument. These are cabs that pick up people on request from United Airlines. They have an arrangement with United Airlines to pick the people up and take them back to the community that the people live in and they are licensed in.

PROSECUTOR: They were hustling people at Woodfield.

DEFENSE COUNSEL: Yes they were, by request.

PROSECUTOR: They have to have a license, that is how the ordinance reads. Do they have a license?

* * *

JUDGE: First of all, there is no evidence presented as to the violation in question. There has been a lot about the law.

PROSECUTOR: I think he agreed to the facts, that is why he started.

JUDGE: Is that correct?

DEFENSE COUNSEL: I think we would Judge. We are saying that I think the police officer marked it inter-urban operation. That is what we are talking about. This is not a case where we are disputing the facts, that I know of anyway.

JUDGE: The only thing I see before me is no public business license.

DEFENDANT FRANBERG: Well, this is what it was. I was on request to pick these people up and the way I understood it was that I don't have to have a Schaumburg license to pick up people who called to take them back. And if I had the business license I would have done it.

JUDGE: Do we have any evidence to present?

PROSECUTOR: The evidence presented is such that the officer, if he were called to testify would testify that they were picking people up within the Village of Schaumburg. He observed them picking up passengers, he verified that they had no business license, the ordinance reads that to pick up people within the

Village of Schaumburg they must definitely have a business license.

JUDGE: Do you stipulate to those facts, counsel?

DEFENSE COUNSEL: Yes.

JUDGE: Then my finding is guilty, $25 and $10 on each count. I think your argument * * *

* * *

DEFENSE COUNSEL: I only want to make it clear that the facts on the record show and we are agreeing to that they were bringing them back to places when they were licensed and that is all, and that we had no Schaumburg license. Is that agreed to?

JUDGE: Right, but I am just telling you how I am going to find you. I honestly don't believe that these cases pertain to these cases."

OPINION

■■■ A stipulation is an agreement between parties or their attorneys with respect to business before the court (*People v. Buford* (1974), 19 Ill. App. 3d 766, 312 N.E.2d 796.) While a stipulation need not follow any particular form, it must be clear, certain and definite in its material provisions (*Scott v. Dreis & Krump Manufacturing Co.* (1975), 26 Ill. App. 3d 971, 326 N.E.2d 74), and it is essential that it be assented to by parties or those representing them. (See 83 C.J.S. *Stipulations* §3 (1953).) In the present case, we find that the only stipulation entered between the parties immediately followed the trial court's inquiry as to whether there was any evidence to present. Defense counsel unequivocally agreed to the prosecutor's statement that defendants were observed picking up passengers within the Village without the proper license. Defense counsel's opening remarks along with defendant Franberg's unsworn comment that he was "on request" to pick up passengers and "take them back" were not part of the stipulation and were never assented to by the prosecutor. Likewise, defense counsel's subsequent attempt to "make it [the stipulation] clear" concerning defendants' actions in merely returning the passengers to Mount Prospect, was not only offered without the prosecutor's concurrence, but occurred subsequent to the trial court's finding of guilty. In sum, defense counsel clearly stipulated to the prosecutor's version of the expected testimony without qualification, and no other stipulations were made. Therefore, that evidence cannot be disputed on appeal. (See *People v. Wiggins* (1973), 9 Ill. App. 3d 1078, 293 N.E.2d 696.) We, therefore, turn our attention to the issues raised for our review.

Defendants initially contend that they were improperly found to have violated section 30—2 of the Village's ordinance since "public

passenger vehicle licenses" are required only of persons in the business of operating them, and not of drivers.

Section 30—2 provides as follows:

> "It shall be unlawful for any person to drive or operate any public passenger vehicle or engage in the business of operating public passenger vehicles in the village, including the operation of one or more such vehicles, without obtaining a public passenger vehicle license for each such vehicle operated, as provided in this chapter and otherwise conforming to the requirements of this Code, and applicable provisions of other ordinances of the village." (Village of Schaumburg Code, ch. 30, §30—2.)

Basically, defendants argue that this section is inapplicable to them as taxicab drivers since the Village code has no provision requiring drivers to obtain individual business licenses. Moreover, they assert, no proof was adduced that defendants owned, controlled or operated the business in which they drove the taxicabs, and they therefore fell outside the section's prohibition of "engag[ing] in the business of operating" the vehicles.

■■■ Our determination of the applicability of section 30—2 of the Village ordinance to defendants requires a brief review of some basic rules of construction. As a general rule, courts apply the same rules of construction to municipal ordinances as they do to statutes. (1A Sutherland on Statutory Construction §30.06 (4th ed. 1972).) The primary rule in construing statutes and ordinances is to ascertain and give effect to the intention of the legislative body. (*Brown v. Department of Revenue* (1980), 89 Ill. App. 3d 238, 411 N.E.2d 882; *Pressley v. City of Chicago* (1960), 26 Ill. App. 2d 283, 168 N.E.2d 41.) The search for legislative intent must begin with the words of the legislation itself, and when the language is clear, its plain meaning must be given effect. (*Finley v. Finley* (1980), 81 Ill. 2d 317, 410 N.E.2d 12.) Under section 30—2, it is unlawful for "any person to *drive or* operate any public passenger vehicle or engage in the business of operating public passenger vehicles in the village * * * without obtaining a public passenger vehicle license." (Emphasis ours.) To interpret this language as being inapplicable to drivers of taxicabs would require us to totally ignore the plain and ordinary meaning of the words "drive" and "or." The use of the disjunctive "or" obviously reveals that the ordinance was meant to apply to separate groups of people—those who "drive" a cab, or those who "operate one," or those who "engage in the business" of operating such vehicles. Therefore, defendants, as drivers of the vehicles, fall squarely within the ambit of this section. While defendants are correct in noting that there is no provision in the ordinance for drivers to obtain a public passenger vehicle license, this does not render invalid a requirement that they drive licensed vehicles. An ordinance may make driving an unlicensed

vehicle alone an offense. (See, *e.g., City of Chicago v. Vokes* (1963), 28 Ill. 2d 475, 193 N.E.2d 40.) Furthermore, we believe that the Village's code, when viewed as a whole, evidences an intent that licensing of vehicles is necessary to ensure that passengers receive safe and adequate service. For instance, the ordinance requires vehicles to be inspected by an approved automotive repair garage (section 30—3) and be kept in clean and sanitary condition (section 30—16) before a license will issue. Given this scheme, it is not unreasonable to conclude that the drivers, who are in actual control and possession of the vehicles and are responsible for their safe operation, are equally subject to the licensing requirements. Under our interpretation, the drivers face penalties for violating section 30—2, and are surely encouraged to insist from the owners of the taxicabs that they either secure the proper license or expect no fares from passengers of the Village. This is consistent with the Village's apparent desire to encourage only safe, licensed vehicles to profit from operating on its streets.

■■ Defendants next argue that the words "in the village" contained in section 30—2 refer to transportation only from one point within the Village to another point within the Village limits, and therefore render the section inapplicable to their alleged intermunicipal conduct. This argument is premised upon defendants' mistaken interpretation of the stipulation of facts. As we have discussed, there was no valid evidence that defendants were returning passengers to the Village of Mount Prospect when they were stopped by the police. The stipulated testimony only establishes that defendants were picking up passengers within the Village without the required license. There is no indication of the passenger's destination. Therefore, the proper starting point is to determine whether the words "in the village" encompass a driver's conduct in picking up a passenger at a point inside the Village without regard to where the passenger desires to be driven. If these words are deemed to be inclusive of these activities, we must then decide whether the Village, as a municipality, has the power to enact an ordinance which holds nonresidents subject to its licensing regulations for simply picking up passengers within its boundaries.

As to the first question, it is evident that to "drive or operate any public passenger vehicle * * * *in the village* without obtaining a public passenger vehicle license" (emphasis ours) by its plain meaning refers to defendants' conduct here. When defendants picked up passengers at the shopping center, they were undisputedly within the limits of the municipality, and were thus driving "in the village" for the purposes of section 30—2. There is no language in this section limiting the licensing requirements to those engaged in intramunicipal travel (*e.g.* "within" the Village), and we will not therefore interpret the section in such a fashion. The more important question is whether the ordinance requiring a license of nonresidents for these activities is valid.

In deciding the validity of this ordinance, we first note the fundamental principle that a taxi is a common carrier for hire which derives its income from the use of public streets, and that the power of municipalities to police such a business is derived from its power to regulate or prohibit the use of its streets for private gain. (*People ex rel. Johns v. Thompson* (1930), 341 Ill. 166, 173 N.E. 137.) In Illinois, this power is derived from specific statutory authority. Section 11—42—6 of the Illinois Municipal Code provides as follows:

> "The corporate authorities of each municipality may license, tax, and regulate hackmen, draymen, omnibus drivers, carters, cabmen, porters, expressmen, and all others pursuing like occupations, and may prescribe their compensation." Ill. Rev. Stat. 1979, ch. 24, par. 11—42—6.

■■ We believe that this statutory grant of authority permits a municipality to enact an ordinance prohibiting a nonresident taxicab driver from providing service to passengers accepted within the municipality unless the vehicle is licensed by it. In *City of Chicago v. Vokes* (1963), 28 Ill. 2d 475, 193 N.E.2d 40, our supreme court upheld guilty findings against nonresident taxidrivers employed by the Evanston Cab Company and Skokie Red Top Cab Company for transporting passengers for hire within the city of Chicago without a proper license in violation of section 23—8 of the city's municipal code. The taxicabs involved, which were licensed by either Evanston or Skokie, maintained a common dispatch office in Evanston. In each case, calls were received in Evanston requesting drivers to go to a Chicago address and transport passengers to another point within the city. The drivers were arrested on each occasion by a Chicago police officer at the point of destination as they received their fares. The relevant ordinance prohibited the operation of unlicensed taxicabs within the city, but excepted from its licensing requirement those cabs that discharged in the city passengers accepted outside the city limits. The taxicab drivers' primary contention on appeal was that the ordinance violated their right to equal protection and due process since it required corporate applicants to have their principal place of business in Chicago. The court rejected this attack on the ordinance, holding that the ordinance provided for a reasonable method of authorizing and supervising activities conducted within its boundaries rather than relying upon the inspection and supervision exercised by the other licensing municipalities. The court also rejected another argument by defendant concerning the alleged inapplicability of a section of the ordinance prohibiting unlicensed cabs from soliciting or accepting passengers within the city. Defendants had argued that this prohibition applied only to taxis coming into the city which discharged passengers accepted outside the city limits, as opposed to those arriving in the city empty which accepted a passenger

in the first instance. The court found, however, that the legislative intent reflected in the ordinance was to prohibit all unlicensed cabs from soliciting business within the city limits regardless of the manner or purpose for which they entered the city.

The *Vokes* decision is significant for several reasons. First, the city ordinance upheld there was derived from the same source of statutory authority as was the present ordinance. Second, the court in *Vokes* recognized that nonresident taxicab drivers were subject to licensing requirements of the city of Chicago. Third, it emphasized that the city's licensing scheme was a proper exercise of the municipality's police power and was designed to insure the safety of taxicab passengers and other motorists.

We find the holding of *Vokes* applicable here. The Village's ordinance in the present case was likewise enacted with the purpose of regulating the fitness of the taxicabs, and their equipment and drivers, for the public's safety and welfare. The ordinance imposed these requirements on taxicab drivers who accepted passengers in the Village regardless of the passenger's destination, since the Village, like the city of Chicago, did not wish to rely on licensing requirements of other municipalities. Although the defendants in *Vokes* only drove their taxicabs from one point within the city to another, this does not render the holding of that case distinguishable from the present one. The hazards posed to those on the streets by an unsafe taxicab are the same regardless of whether the taxicab remains within the city after picking up a passenger, or eventually leaves the municipality. Therefore, to insure the safety of its streets, the Village, as a municipality, has the power and the interest to require the licensing of vehicles that initiate their service within the municipality. In addition, the taxicab drivers derive monetary benefits from accepting passengers within the city and take advantage of police protection while in the city. We know of no reason why they should escape the licensing requirements that residents of the municipality must adhere to.

Our holding is buttressed by the case of *City of Chicago v. Dorband* (1938), 297 Ill. App. 617, 18 N.E.2d 107, where the court commented upon a municipality's power to subject nonresidents to its taxicab licensing scheme. Although the court there found the ordinance at issue applicable to the owners of the taxicabs and not the defendant drivers due to the ordinance's restrictive language, it nevertheless indicated that the city of Chicago had the power to license those accepting passengers inside its limits. The court stated:

> "It is not contended by the city of Chicago that a taxicab, whose owner's principal place of business is in Evanston, may not lawfully be driven over and through the streets of Chicago with passengers whose trip commenced in the city of Evanston or that

such passengers may not be returned in said taxicab over the streets of Chicago to Evanston, but it is seriously urged that when the taxicab service is rendered wholly within the limits of Chicago *or initiated therein,* nonresident owners of such taxicabs may be required to pay the same license fee imposed on owners of taxicabs whose principal place of business is in the city of Chicago. We think this contention is sound." (Emphasis added.) *Dorband,* 297 Ill. App. 617, 628-29, 18 N.E.2d 25, 111-112.

Defendants in the instant case have cited several cases in an effort to establish that a municipality has no power to license intermunicipal transportation. We find each case to be factually dissimilar and unpersuasive. They further point to the Village's failure to supply authority for the proposition that simply picking up a passenger within the municipality's limits is sufficient for an ordinance violation. While we believe that the *Vokes* and *Dorband* decisions provide ample support for our holding that a municipality may enact an ordinance prohibiting such conduct, we agree with defendants that no court in this jurisdiction has been presented with the precise factual situation here. Nevertheless, there is authority elsewhere that a municipality is empowered to pass an ordinance requiring taxicab operators to be licensed by it for accepting or discharging passengers therein, regardless of whether or not the vehicle's trip occurs entirely within the city. (See, *e.g., State v. Gamelin* (1940), 111 Vt. 245, 13 A.2d 204.) Therefore, we conclude that defendants were properly found to have violated section 30—2 of the Village's ordinance.

Finally, defendants contend that the Village has improperly changed its position on appeal regarding the source of its power to enact the ordinance in question. The Village argued to the trial court that it was justified in enacting the licensing ordinance under its powers as a home rule municipality under the Illinois Constitution (Ill. Const. 1970, art. VII, §6(a)), but now primarily maintains that its ability to do so derives from specific statutory authority (Ill. Rev. Stat. 1979, ch. 24, par. 11—42—6).

■■ We are not concerned, however, with the Village's earlier arguments or the trial court's basis for sustaining the Village's position. A trial court's order may be sustained on appeal for reasons other than those relied upon by it if correct, irrespective of the court's reasoning. (*U-Haul Co. v. Town of Cicero* (1980), 87 Ill. App. 3d 915, 410 N.E.2d 286.) We have chosen to uphold the validity of the Village's ordinance on statutory grounds rather than examine it under the home rule provision, since a court should avoid passing upon a constitutional issue if the case can be decided without doing so (*City of Chicago v. Abdullah* (1979), 76 Ill. App. 3d 325, 395 N.E.2d 50). It is within our authority to decide this controversy on grounds other than those presented by the parties. (*Mitchell v. Mitchell* (1977), 54 Ill. App. 3d 18, 369 N.E.2d 276.) Consequently, defendants'

10

remaining arguments concerning the Village's alleged lack of authority to enact the licensing scheme under its home rule powers need not be discussed.

For the reasons stated, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.