LEVITT HOMES, INC., Plaintiff, *v.* OLD FARM HOMEOWNERS' ASSOCIATION *et al.*, Defendants.—(Gregory Locke *et al.*, Plaintiffs-Appellants, *v.* Levitt Homes, Inc., *et al.*, Defendants-Appellees.)

Second District No. 82—492

Opinion filed December 22, 1982.

302

H. Kent Heller and Jan H. Ramsey, both of Harlan Heller, Ltd., of Aurora, for appellants.

Robert C. Johnson, Richard L. Fenton, and Steven B. Isaacson, all of Sonnenschein, Carlin, Nath & Rosenthal, and Marvin J. Glink and Peter D. Coblentz, both of Ancel, Glink, Diamond, Murphy & Cope, both of Chicago, for appellees.

JUSTICE REINHARD delivered the opinion of the court:

In these two actions consolidated in the trial court, Levitt Homes, Inc. (Levitt) filed suit against the Old Farm Homeowners' Association, Willowgate Homeowners' Association, and various known and unknown homeowners (Homeowners) seeking injunctive and other relief based upon tortious interference with prospective contractual relations, libel and slander. Homeowners filed suit against Levitt and the city of Naperville (city) for injunctive and other relief to enforce subdivision restrictive covenants and certain city of Naperville ordinances, and to seek damages based upon several theories of recovery. After an evidentiary hearing on Levitt's and Homeowners' motions for preliminary injunctions, the trial court entered an order denying

both motions. Only Homeowners appeal from that interlocutory order denying their motion for a preliminary injunction. See Supreme Court Rule 307(a)(1) (87 Ill. 2d R. 307(a)(1)).

The issues presented for review by Homeowners are: (1) whether Homeowners have established the elements required for the issuance of a preliminary injunction and are entitled to a preliminary injunction enjoining Levitt from building or selling certain homes on the theories that (a) Levitt violated certain ordinances of the city, (b) Levitt violated certain restrictive covenants which it could not later amend, and (c) Levitt is estopped by its promises to some of the Homeowners; and (2) whether Homeowners are entitled to a preliminary injunction enjoining the city from issuing building permits to Levitt. While Levitt did not appeal the ruling below against it, Levitt affirmatively asserts in its brief that Homeowners' actions constituted such misconduct that they are precluded from equitable relief under the doctrine of "unclean hands."

In 1978, pursuant to city of Naperville ordinance 78—106 (Naperville, Ill., Ordinance 78—106 (1978)) Levitt began marketing the Willowgate subdivision (Willowgate) as a planned unit development on a parcel of property known as Old Farm Unit 5 in Naperville, Illinois. Between 1978 and 1981 Levitt sold approximately 40 homes, selected from five model types, in Willowgate. The owners took title between 1979 and 1981. Levitt's senior vice-president Harvey Rafofsky testified that these homes ranged in price from "the high 60's to the mid 80's" and in size from 1,000 to "16 or 1800 square feet." Thomas Trybus, a homeowner, testified that the smallest model was 1,200 square feet while Doug Engebrethson, another homeowner, testified that the largest model was 2,200 square feet. All of these homes have two car garages. Rafofsky testified that Levitt failed to complete Willowgate due to market conditions which made selling this type of home difficult.

Levitt then decided to market the new Gingerplace subdivision (Gingerplace) in the areas of Old Farm Unit 5, Willowgate subdivision, where homes had not been built. Levitt planned to build 82 homes. These homes were to consist of two models of single-story homes which would be either a 979-square-foot two-bedroom model selling for $48,990 or a 1,068-square-foot three-bedroom model selling for $50,990. Both models would have one-car garages. According to Rafofsky, the Gingerplace homes were to be of comparable quality to the homes in Willowgate except they would be smaller.

Gingerplace would be located in a horseshoe pattern surrounding Willowgate on the east, west and south and across Modaff Road from

the Old Farm subdivision (Old Farm). Old Farm was also developed by Levitt and consists of approximately 500 homes built between 1975 and 1980. Rafofsky testified that the homes in Old Farm are generally larger than those in Willowgate and were also generally higher in price.

Sales of the Gingerplace homes began May 22, 1982, preceded by a heavy advertising campaign and a salesperson training program with combined costs of $50,000. On May 22, 1982, as Levitt was beginning its sales drive at Gingerplace, a group of protestors gathered on the side of the public street leading into Gingerplace near Levitt's sales trailer. Though a great deal of testimony at the hearing below dealt with the protestors' activities, it is unnecessary to discuss these activities since Levitt has not appealed the denial of its motion to preliminarily enjoin the protesters.

Ordinance 78—106 (Naperville, Ill., Ordinance 78—106 (1978)) authorizing Levitt to build a planned unit development on Old Farm Unit 5 was enacted September 5, 1978, by the Naperville city council and recorded with the county recorder September 28, 1978. The document entitled "Declarations of Covenants, Conditions and Restrictions" (declaration) at issue in this case was not before the city council at the time it enacted the ordinance nor was it recorded with this ordinance. Rather, the declaration was filed with the county recorder on July 10, 1979.

According to the declaration all homes built in Old Farm Unit 5 were subject to a 1,000 square foot minimum floor space requirement and a minimum cost of construction equal to:

"$45,000 x $\dfrac{\text{Consumer Price Index (CPI) at commencement of construction.}}{\text{CPI as of date hereof.}}$"

The declaration contained a provision allowing Levitt to amend the minimum floor space and minimum cost restrictions.

Homeowners introduced another document which attorney Charlotte Rubenstein testified was supplied to her by Levitt. She obtained this document in connection with her clients', the Trybuses, purchase of a home in Willowgate. This document was similar to the declaration filed by Levitt except that the minimum floor space requirement was 1,200 square feet and the minimum cost formula was:

"$65,000 x $\dfrac{\text{CPI at commencement of construction.}}{\text{CPI as of date hereof.}}$"

The Trybuses purchased their home in May 1980, approximately 10 months after Levitt filed its July 10, 1979, declaration.

On May 6, 1982, Levitt invoked the provision allowing it to amend and filed amendments to the declaration changing the minimum floor space requirement to 900 square feet and the minimum cost of construction to a flat $44,000. These amendments, like the original declaration, were not submitted to the city council for approval.

Walter Newman, director of community development for the city of Naperville testified that he administers the city's zoning ordinances and that the city does not require developers of planned unit developments to have minimum floor space or minimum cost restrictions in the agreements annexing these developments to the city. He testified further that the city had no interest in whether such restrictions existed in planned unit developments or in any amendments to such restrictions.

Several Willowgate homeowners testified that Levitt sales personnel represented to them, at the time they bought their homes, that all homes built in Willowgate would be carefully controlled to avoid uniformity of model or color and that at least five different models would be interspersed throughout the subdivision. Gregory Locke testified he had been told that Willowgate would consist of "one of the five models." Thomas Trybus testified he had been told that if he wanted to build a home on a lot next to a similar model or similar colored home, the other homeowner's permission would be required. Thomas Clark testified he had been told that sister model homes would be built on the lots behind his home. Jeanne Noonan testified she had been told that Willowgate was going to be comprised of homes that were like the five models. Mary Chiappetta testified she had been told that Levitt "would be bringing over" to Willowgate two models from Old Farm and would possibly be adding a few more larger models. These homeowners testified that these representations affected their decisions to buy.

Along with the Old Farm Homeowners, the Willowgate Homeowners testified they believed the value of their homes would be lowered by the building of the homes in Gingerplace because of the use of only two models, the lower square footage, and the lower cost. Two real estate appraisers testified. Richard Hauser testified for Homeowners that building the Gingerplace homes would cause a 5-10% depreciation in the value of the existing homes. Ronald Bomba testified for Levitt that the Gingerplace homes would not have a detrimental effect on existing property values.

At the close of all the evidence, the trial court denied all motions

for preliminary injunctions. The court found that Homeowners had an adequate remedy at law "if, in fact, they will suffer any damages to the valuation [sic] of their property by virtue of diminution." The court also found that the restrictions concerning minimum floor space and minimum cost were not a part of the final plat. Therefore, no injunction should issue barring the issuance of building permits by the city to Levitt.

In order for a preliminary injunction to issue, a plaintiff must establish (1) that he possesses a clearly ascertained right which needs protection, (2) that he will suffer irreparable harm without the injunction, (3) that there is no adequate remedy at law for his injury, and (4) that he is likely to be successful on the merits of his action. (*Cross Wood Products, Inc. v. Suter* (1981), 97 Ill. App. 3d 282, 284, 422 N.E.2d 953; *Crest Builders, Inc. v. Willow Falls Improvement Association* (1979), 74 Ill. App. 3d 420, 422, 393 N.E.2d 107.) The issuance of a preliminary injunction is applicable only to situations where an extreme emergency exists and irreparable and serious injury will result in the absence of the injunction. (*Dixon v. Village of Lombard* (1977), 50 Ill. App. 3d 590, 593, 365 N.E.2d 1131.) The issuance of a preliminary injunction is within the sound discretion of the trial court and is to be used cautiously and only in cases of great necessity. (50 Ill. App. 3d 590, 593, 365 N.E.2d 1131.) Its determination will not be overturned absent a showing of the abuse of that discretion. (*Shorr Paper Products, Inc. v. Frary* (1979), 74 Ill. App. 3d 498, 502, 392 N.E.2d 1148.) As it is not the purpose of the preliminary injunction to determine controverted rights or decide the merits of the case, a court of review looks to the sufficiency of the evidence only for the limited purpose of ascertaining whether the trial court's discretion has been abused. *Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 500, 422 N.E.2d 1166.

Homeowners premise their contention that they possess a clearly ascertained right which needs protection upon three bases: (1) that Levitt improperly amended certain restrictive covenants in the declaration; (2) that Levitt has not complied with certain of the city's zoning ordinances; and (3) that Levitt is estopped by its oral and written promises. The declaration was filed in the office of the Du Page County Recorder of Deeds on July 10, 1979. It contained a recital that it created certain covenants, conditions, restrictions, easements and other reservations "so as to assist in assuring the development of the property, in protecting the value and desirability of the property, and in preserving the general character of the property." The declaration provided in section 5.04 that each owner shall have the right to

enforce the covenants and other rights created therein except against Levitt. Further, in section 5.08 Levitt specifically reserved the right to amend, alter, change, modify, waive, revoke or delete any of the covenants and other rights pertaining to minimum floor area, minimum cost of construction and other rights created, "it being the intent hereof that the right reserved in this section 5.08 shall not negate the existence of a general development scheme with respect to property so as to deprive the owners of the benefit of, or the power to enforce, the covenants, conditions and restrictions contained in this declaration." Homeowners argue that the amendments to the declaration filed May 6, 1982, which reduced the minimum floor space and cost of construction from that in the declaration, are void since they interfere with the covenants and other rights in the declaration enacted for the general development of the subdivision for the Homeowners' benefit as set forth therein. They contend that the right to amend contained in the declaration "may be exercised only to make the covenants amended more restrictive or amend the covenants in a fashion which will not, in fact, interfere with the development of the community as planned." Levitt counters that it specifically reserved the right to make amendments, that the two amendments do not negate the general development scheme, and that the covenants cannot be enforced against Levitt under the express terms of the declaration.

■■ ■ Generally, restrictive covenants affecting land will be enforced according to their plain and unambiguous language (*Hawthorne Hills Association v. Lawrence* (1980), 85 Ill. App. 3d 377, 381, 406 N.E.2d 869), and, unless against public policy, or where the principles of waiver or estoppel operate, their violation will be enjoined by the court. (*Cordogan v. Union National Bank* (1978), 64 Ill. App. 3d 248, 253, 380 N.E.2d 1194.) A subdivider who expressly reserves the right to revoke restrictions and conditions set forth in a declaration of rights and conditions contained in contracts of sale of lots may later change the covenants and other promises respecting the use of the land where the intent and purpose of the reservation to revoke is evident. (See *Fox Lake Hills Property Owners Association v. Fox Lake Hills, Inc.* (1970), 120 Ill. App. 2d 139, 256 N.E.2d 496.) We must look to the language of the declaration in order to determine what rights were reserved, applying the rule that an instrument is to be construed most strongly against its author. (See *Crest Builders, Inc. v. Willow Falls Improvement Association* (1979), 74 Ill. App. 3d 420, 393 N.E.2d 107.) Decisions in other jurisdictions generally hold that a grantor may retain the right to make exceptions to or revocation of restrictions contained in a subdivision plat or deed where the intent to

reserve such power is included in the instrument. See *Davis v. Miller* (1957), 212 Ga. 836, 96 S.E.2d 498; *Matthews v. Kernewood, Inc.* (1945), 184 Md. 297, 40 A.2d 522; *Thrasher v. Bear* (1940), 239 Ala. 438, 195 So. 441.

■ The declaration filed July 10, 1979, expressly provides in section 5.02 that the obligations contained in the declaration, except for section 4.01 and 4.02 pertinent to easements, shall not be applicable to Levitt, and in section 5.04 that each owner shall have the right to enforce the covenants against other owners but not against Levitt. Section 5.08 contains an express reservation by Levitt of the right to amend, modify or otherwise revoke any of the covenants, and, specifically, those pertaining to minimum floor area of a dwelling and construction cost which do not negate the existence of a general development scheme with respect to property. We interpret the declaration, read as a whole, to confer benefits and rights to the homeowners to be enforceable against each other. However, the benefits and rights conferred thereunder are expressly intended not to be enforceable against Levitt with regard to modifications in section 5.08 except that Levitt's reservation of rights to modify in 5.08 shall not negate the existence of a general development scheme.

■ In the recitals in the declaration it is stated that the property "shall be developed as a planned suburban residential community" with the creation of certain covenants and restrictions upon the property "to assist in assuring the development of the property, in protecting the value and desirability of the property, and in preserving the general character of the property." This recital is consistent with our interpretation that the covenants and restrictions confer benefits and rights to the homeowners against each other in protecting the value of their property, and retain in Levitt the right to modify the covenants and restrictions to develop the property consistent with the general development scheme and character of the property. Levitt's amendment of the declaration to permit smaller houses does not negate the general development scheme. The lots have not been resubdivided, commercial or multi-family dwellings are not allowed, the minimum floor space square foot requirement has been reduced only 21 square feet, and the construction cost reduction is not a drastic change. While it is evident from the proofs at the hearing below that the planned construction of homes will be different from existing homes in that they will be slightly smaller, will all be one-story, will not have two-car garages, and will initially have available only two types of home design, they will have the same construction quality as the existing homes in Willowgate. We conclude under the facts pre-

sented below that the modifications in the amended declaration do not negate the existence of the general development scheme of the subdivision. Accordingly, Homeowners have failed to establish that they possess a clearly ascertained right to be protected.

Alternatively, Homeowners contend that the city has not enforced its ordinances and that they are entitled to injunctive relief against the city and Levitt for Levitt's failure to comply with the zoning and subdivision control ordinances.

Homeowners argue that Levitt improperly changed its planned unit development (PUD) at Old Farm Unit 5 when it imposed the declaration without having submitted it to the city council as "supporting data" when it sought and obtained city approval for the development. They argue Levitt, again improperly, changed the PUD when it amended the declaration without city council approval. Homeowners contend that section 4.9.2(5) of Ordinance A—139 (Naperville, Ill., Ordinance A—139, section 4.9.2(5) (1977)) establishes the only allowable procedures for changing a PUD. That section provides procedures for major or minor changes both of which require city council approval. Homeowners argue that Levitt's declaration and later amendments thereto made changes to the PUD without the requisite city council approval and that this lack of approval renders the PUD void. They contend that the declaration is valid, but that no building permits can be issued for Gingerplace unless the city council approves the amended declaration under the section 4.9.2(5) procedures. They maintain section 8.002.7 of Ordinance 76—34 (Naperville, Ill., Ordinance 76—34, section 8.002.7 (1976)) bars the issuance of building permits in this case.

Levitt concedes that it never obtained city council approval of the declaration or amendments. However, it contends no such approval is required since the declaration is not a part of the PUD, and, therefore, the imposition or amendment of the declaration is not a change in the PUD.

Section 8.002.7 of Ordinance 76—34 provides that:

> "No building permit shall be issued for the construction of any building, structure, or improvement unless the owner of the land upon which said building, structure, or improvement is to be constructed has complied with the requirements of the ordinances of the City."

Ordinance A—139, section 4.9.2(5) provides, in part, that:

> "[A] planned unit development project shall be developed only according to the approved and recorded final plat and all *supporting data*." (Emphasis added.)

Homeowners maintain that the term "supporting data" includes any restrictive covenant to be applied to property within the planned unit development. Homeowners base their contention on the following language from Ordinance A—139, section 4.9.4:

"The planned unit development plats and supporting data shall include at least the following information: *** (2) *Preliminary Plat Stage* *** (e) Covenants—Proposed agreements, provisions, or covenants which will govern the use, maintenance, development and continued protection of the planned development and any of its common open space.

\* \* \*

(3) *Final Plat Stage* *** (f) Covenants—Final agreements, provisions or covenants shall govern the use, maintenance, and continued protection of the planned unit development."

▆▆ ▆ "The primary rule in construing statutes and ordinances is to ascertain and give effect to the intention of the legislative body." (*Village of Schaumberg v. Franberg* (1981), 99 Ill. App. 3d 1, 5, 424 N.E.2d 1239.) This is done " 'by concentrating on the terminology, its goals and purposes, "the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance." ' " (*Palella v. Leyden Family Service & Mental Health Center* (1980), 79 Ill. 2d 493, 500, 404 N.E.2d 228.) Applying this standard, we hold that the city council in enacting Ordinance A—139 did not intend that restrictions such as the ones in issue here be included in the supporting data submitted with the final plat of a PUD.

▆▆ An ordinance must be read as a whole to determine its meaning. (*Pascal v. Lyons* (1958), 15 Ill. 2d 41, 153 N.E.2d 817.) Section 4.9.1 of Ordinance A—139 states that the purposes of allowing planned unit developments are to permit the following:

"(1) A maximum choice in the types of environment available to the public by allowing a development that would not be possible under the strict application of the other sections of this Ordinance.

(2) Permanent preservation of common open space and recreation areas and facilities.

(3) A pattern of development to preserve natural vegetation, topographic and geologic features.

(4) A creative approach to the use of land and related physical facilities that results in better development and design and the construction of aesthetic amenities.

(5) An efficient use of the land resulting in more economic

net-works of utilities, streets, schools, public grounds and buildings, and other facilities.

(6) A land use which promotes the public health, safety, comfort, morals and welfare.

(7) Innovations in residential, commercial and industrial development so that growing demands of the population may be met by greater variety in type, design and layout of buildings and by the conservation and more efficient use of open space ancillary to said buildings.

The planned unit development is intended to provide for developments incorporating a single type or a variety of related uses which are planned and developed as a unit. Such development may consist of conventionally subdivided lots or provide for development by a planned unit development plat in keeping with the purpose of the plan."

This language demonstrates that the intent of the planned unit development provisions is to allow more flexibility in development than is available under the general zoning ordinance provisions while continuing to allow the city to protect the interests it normally protects through general zoning provisions. This intention is reinforced by section 4.9.2 of Ordinance A—139 which provides that a planned unit development may "be granted as a special use" and "may depart from the normal procedures, standards, and other requirements of the other sections of this Ordinance." The ordinance then sets forth a procedure for approval of the PUD which ultimately requires approval by the city council. Thus, the ordinance provides for the city council to approve or disapprove individual planned unit developments as special uses in order to protect the interests of the city which are protected by the general zoning ordinance provisions where special uses are not sought.

These city interests are stated in section 1.2 of Ordinance A—139 which details the matters regulated as follows:

"Hereafter in the City of Naperville, Illinois, the erection and use of any new building or structure, or the relocation, enlargement or structural alteration of any existing building or structure, or any change in use, or new or additional use made of any tract of land or of existing building or structure,

(a) Shall be for only those principal uses permitted, including any use or activity customarily incidental or accessory thereto unless otherwise restricted or prohibited;

(b) Shall provide and preserve the required building setback, front yard, side yard, rear yard, lot area per family, lot

width, alley setback, corner visibility and automobile parking areas;

(c) Shall not exceed the height limit; and

(d) Shall not encroach upon or reduce the required open spaces surrounding any existing building.

all as specified in this Ordinance."

This provision does not include any reference to minimum square footage or minimum cost of construction. Since the city expressed no interest in minimum square footage or minimum cost of construction in the general zoning provisions, it is unreasonable to hold that the city intended to exert such an interest in its planned unit development provisions since the intention of planned unit developments is greater flexibility in development than is available under the general zoning ordinance.

■■■ Reading the ordinance as a whole the language of section 4.9.4 relied on by Homeowners cannot be said to cover the covenants at issue in this case. Rather, it is more reasonable to read this language to mean proposed and final agreements between the developer and the city such as the "Statement of Intent and Agreement" recorded with Ordinance 78—106 (Naperville, Ill., Ordinance 78—106 (1978)) which authorized the Old Farm Unit 5 PUD.

Homeowners also contend that Ordinance 76—34 (Naperville, Ill., Ordinance 76—34 (1976)) supports their argument. Section 8.003.2I of 76—34 reads:

*Other Information Required* at time of Preliminary Plat application: *** (5) Summary of all restrictions intended to be imposed by the Final Plat or by Deeds of conveyance as to the use of all property within the subdivision: including area of buildings for residence use, if any, or other design limitations or planning schedules."

Section 8.003.4B provides:

*Supporting Documents with Final Plat.* The following supporting documents and data, shall be submitted with said Final Plat: *** 4. All covenants such as homeowners association covenants and agreements which are to be applied to the property."

■■■ Again, reading the ordinance as a whole, we hold that covenants such as the ones in issue here were not required by this ordinance to be submitted at either the preliminary or final plat stage.

The intent of Ordinance 76—34 is stated in section 8.001 as follows:

"The intent of these regulations is to provide for the orderly

and harmonious development of the City and the surrounding areas within the City's planning jurisdiction."

The ordinance then goes on to detail the information a subdivider must submit for preliminary plat approval and the supporting data required to be submitted with the final plat. These requirements deal with the layout of the subdivision, the specifications for streets, parks and other public use areas, traffic studies, and other factors that concern orderly development of the subdivision and the demands it will make on city services.

In this context, the section 8.003.2I(5) requirement of a summary of restrictions as to "the area of buildings for residence use" must refer to the area of the subdivision in which residences will be constructed. Interpreting "area" to mean square footage of a particular home would be giving subsection 5 an interpretation that is not consonant with the intent of surrounding subsections.

Similarly, the section 8.003.4B4 requirement that "[a]ll covenants such as homeowners association covenants" be supplied does not create an obligation to submit the covenants at issue in this case. This language appears in a list of required data all of which deals with the subdivision and its relationship to city services. Thus, the best interpretation of section 8.003.4B4 is that any covenant of the nature of a homeowners' association covenant must be provided since such a covenant would deal with common area maintenance and other services which the city might otherwise provide.

Homeowners also contend that Levitt should be enjoined, under the theory of promissory estoppel, from denying the promises made to them by Levitt sales personnel. The testimony of various homeowners sought to be construed as promises are that Levitt sales persons indicated that: the remainder of the houses in the area "would be comparable to what we have"; the other homes built would be exactly like the one to be purchased except with a different front or another model exactly as they had now in the area with a different fronting; and the houses in Willowgate were going to be comprised of houses that were like the five models. Furthermore, testimony was adduced that a map was displayed in Levitt's sales office showing the entire subdivision area as being Willowgate, that brochures distributed when Willowgate was being developed showed only the five models presently being built, and representations were made that in future development houses would be bigger.

■■■■ In order to maintain an action for promissory estoppel, the law requires that there be a promise which is unambiguous in its terms and reliance by the party to whom the promise is made. The

reliance must be expected and foreseeable by the party making the promise and the party to whom the promise is made must rely upon the promise to his detriment. (*Dale v. Groebe & Co.* (1981), 103 Ill. App. 3d 649, 431 N.E.2d 1107; *S.M. Wilson & Co. v. Prepakt Concrete Co.* (1974), 23 Ill. App. 3d 137, 318 N.E.2d 722.) A fraudulent intent is not essential for recovery under promissory estoppel. (*Lincolnland Properties, Inc. v. Butterworth Apartments, Inc.* (1978), 65 Ill. App. 3d 907, 912, 382 N.E.2d 1250; *S.M. Wilson & Co. v. Prepakt Concrete Co.* (1974), 23 Ill. App. 3d 137, 141, 318 N.E.2d 722; but *cf. Hughes v. Encyclopaedia Britannica, Inc.* (1954), 1 Ill. App. 2d 514, 117 N.E.2d 880.) However, if the action is specifically one based upon fraud and deceit, then fraud must be pleaded. (*Zaborowski v. Hoffman Rosner Corp.* (1976), 43 Ill. App. 3d 21, 356 N.E.2d 653.) Homeowners' count V pleads the elements of promissory estoppel.

 Under the record before us at this stage of the proceedings, there is insufficient evidence to support preliminary injunctive relief based upon the theory of promissory estoppel. The statements attributed to Levitt sales personnel relative to future development in the context testified to below by various homeowners do not amount to an unambiguous promise to build *only* similar models of houses in the subdivision. Rather, it appears that the *intention* was to build similar houses. Nor is there sufficient testimony to establish the extent to which the homeowners relied on Levitt's sales personnel's statements of future development in their determination to purchase a home. Moreover, any reliance on these oral statements may have been unreasonable considering a statement in the real estate sales contract signed by several of the purchasers, which provides:

> "29. This document contains the entire agreement between the parties. NO REPRESENTATIONS, WARRANTIES, UNDERTAKINGS, AGREEMENTS OR PROMISES (WHETHER ORAL, WRITTEN, EXPRESS OR IMPLIED), CAN BE MADE OR HAVE BEEN MADE BY EITHER SELLER OR PURCHASER TO THE OTHER, EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT OR IN THE HOME WARRANTY BOOKLET. No amendment, supplement, or rider to this Contract shall be binding unless in writing and executed by both Purchaser and Seller. No employee, agent, broker, salesman, officer or other representative of Seller has authority to make or has made any statement, representation, warranty, undertaking, agreement or promise (either oral, written, express or implied) in connection with this Contract or the Premises, supplementing or amending the provisions of this Contract."

However, we need not ascertain the applicability of this provision to determine the issue before us on this appeal from the denial of a preliminary injunction, for the facts below do not clearly establish an unambiguous promise which Homeowners relied upon in the purchase of their houses.

Additionally, we point out that the trial court found that Homeowners have an adequate remedy at law in the form of monetary damages "if, in fact, they will suffer any damages to the valuation of their property by virtue of diminution." For there to be an adequate remedy at law which will deprive equity of its power to grant injunctive relief, the remedy must be clear, complete, and as practical and efficient to the ends of justice, and its prompt administration as the equitable remedy. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540, 549, 370 N.E.2d 223; *K.F.K. Corp. v. American Continental Homes, Inc.* (1975), 31 Ill. App. 3d 1017, 1021, 335 N.E.2d 156.) Where money damages is an adequate remedy, injunctive relief is not proper. (*Allstate Amusement Co. of Illinois, Inc. v. Pasinato* (1981), 96 Ill. App. 3d 306, 308, 421 N.E.2d 374.) We conclude that there is adequate evidence in the record to support the trial judge's finding, and this is an additional basis to deny the preliminary injunction.

It was disputed at the hearing below whether Homeowners would suffer any depreciation in the value of their homes by the future construction of the Gingerplace homes in the subdivision. Homeowners' expert witness, Robert Hauser, a real estate appraiser, testified that in his opinion the construction of the Gingerplace homes would result in a 5 to 10% depreciation in the value of Homeowners' homes. On the other hand, Levitt's real estate appraiser, Ronald Bomba, stated that the development of Gingerplace would not have a detrimental effect on property values in Willowgate. Thus, if there is damage to Homeowners' property values, it appears to be ascertainable in an action at law. While several persons testified to their fears that the Gingerplace homes would all be in a row, looking exactly alike, the proofs at this stage of the proceedings did not establish this contention. The evidence below was that Gingerplace would consist of the same quality home construction as in Willowgate, would initially consist of two types of houses, and would consist of one-story, one-car garage homes, some with two bedrooms, others with three bedrooms. There was no evidence that the homes were unsightly, of poor construction, radically different from the Willowgate homes, or other than single-family dwellings. Thus, there is insufficient evidence to establish any other basis why the remedy at law for these changes

would be inadequate. Accordingly, from the evidence adduced below, we find the trial court did not abuse its discretion in finding an adequate remedy at law existed.

For the foregoing reasons, we find that the trial court properly exercised its discretion in denying a preliminary injunction under the facts presented to it. Therefore, we need not consider any other contentions raised by Homeowners, nor determine whether equitable relief should be denied Homeowners under the doctrine of "unclean hands" as asserted by Levitt.

Affirmed.

SEIDENFELD, P.J., and HOPF, J., concur.