(No. 59020.—

COSMOPOLITAN NATIONAL BANK, Trustee, *et al.*, Appellees, v. THE COUNTY OF COOK *et al.*, Appellants.

*Opinion filed September 20, 1984.*

304

Richard M. Daley, State's Attorney, of Chicago (Jane Clark Casey, Deputy State's Attorney, Matthew M. Klein, Assistant State's Attorney, James F. Henry, Special Assistant State's Attorney, and Gould & Ratner, of

counsel), for appellant County of Cook.

Ancel, Glink, Diamond, Murphy & Cope, P.C., of Chicago (Marvin J. Glink and John B. Murphey, of counsel), for appellant Village of Richton Park.

Daniel L. Houlihan & Associates, of Chicago (Daniel L. Houlihan, of counsel), and Kirkland & Ellis, of Chicago (Frank L. Winter, of counsel), for appellees.

JUSTICE SIMON delivered the opinion of the court:

After a long and convoluted history, this case now comes before us on the straightforward questions whether the decree entered in the circuit court of Cook County is inherently self-contradictory and, if not, whether it is against the manifest weight of the evidence. A short review of the history of the case is necessary to establish our perspective.

In 1974, John Sexton Contractors and Eileen Sexton, through Cosmopolitan National Bank Trust No. 21257 (Sexton), acquired the subject property for the express purpose of developing and operating a sanitary landfill. The property is located in an unincorporated area of Cook County, bounded on the east by Interstate 57 (I-57), on the west by Central Avenue, on the south by Sauk Trail, and on the north by railroad and utility rights-of-way. Cook County is a home rule unit. The primary objections to the landfill came from the village of Richton Park, which is located just across I-57 to the east, and particularly from residents of the Lakewood subdivision who live closest to the subject property. The property was zoned R—3, single-family residential (now relabeled as R—4), a classification which does not allow sanitary landfills. In May 1975 Sexton applied to the Illinois Environmental Protection Agency (EPA) for a permit to develop the property as a sanitary landfill. That permit was issued in August 1975 subject to certain

standard EPA conditions, one of which was local zoning approval. In September 1975, this court decided *Carlson v. Village of Worth* (1975), 62 Ill. 2d 406, which held that local zoning jurisdiction over sanitary landfills was preempted by the Environmental Protection Act (Ill. Rev. Stat. 1973, ch. 111½, par. 1001 *et seq.*), which gave exclusive jurisdiction to the EPA. Sexton interpreted *Carlson* to mean that it need not comply with Cook County zoning ordinances by applying for a zoning change and a special-use permit from Cook County. During the period in which Sexton sought EPA approval, both Cook County and the village of Richton Park (the village) objected to Sexton's plan. In September 1976 the EPA issued a development permit, followed in May 1977 by findings of fact. The EPA operating permit was issued for the landfill on September 13, 1977, and operation commenced on September 28, 1977.

In March 1977, Cook County filed a complaint in the circuit court of Cook County against Sexton, alleging that the development work was in violation of the Cook County zoning ordinance and seeking to enjoin further development and operation of the landfill. The circuit court ruled in favor of Sexton, but on direct appeal (58 Ill. 2d R. 302(b)), this court reversed (*County of Cook v. John Sexton Contractors Co.* (1979), 75 Ill. 2d 494). This court held that the 1970 Constitution of the State of Illinois confers concurrent jurisdiction over sanitary landfills on the EPA and on home rule units of local government; *Carlson* and *O'Connor v. City of Rockford* (1972), 52 Ill. 2d 360, were distinguished by observing that those cases did not involve home rule units. Based on that holding, the EPA has authority to regulate the landfill, but actual choice of site is subject to the home rule unit's zoning restrictions. On remand, the village intervened and the circuit court of Cook County granted a preliminary and permanent injunction against operation

of the landfill and also granted the County's motion for judgment on the pleadings. The appellate court affirmed the injunction. (*County of Cook v. John Sexton Contractors Co.* (1980), 86 Ill. App. 3d 673.) The landfill has remained closed since September 17, 1979.

Next, Sexton applied to Cook County to reclassify a portion of the property from R—4 single-family to P—2 Public Open Space recreational use and another portion from R—4 to I—1 restricted industrial, and also for a special-use permit to operate a sanitary landfill as an interim use of the subject property. The Cook County board of zoning appeals recommended that both the rezoning and special use be granted. However, the Cook County board of commissioners voted to deny both the rezoning and the application for special use as a sanitary landfill.

Sexton then filed the present action in the circuit court of Cook County seeking a declaratory judgment that the Cook County zoning ordinance is invalid insofar as it prohibits both the proposed industrial and open-space end uses of the subject property and the interim use as a sanitary landfill. The village again intervened. The circuit court held the ordinance invalid insofar as it prohibits the reclassification, but further held that plaintiffs had not met their burden of showing by clear and convincing evidence that they satisfied the six Cook County special-use criteria and therefore denied the requested interim use as a sanitary landfill. Sexton appealed from the portion of the judgment dealing with the special-use permit, and Cook County and the village cross-appealed from the portion holding the Cook County ordinance invalid insofar as it prohibits industrial and open-space uses on the subject property.

The appellate court reversed both portions of the judgment. (116 Ill. App. 3d 1089.) The open-space and restricted industrial uses were invalidated as overly

broad. As for the proposed interim use as a sanitary landfill, the appellate court found the trial court's order to be internally self-contradictory and certain witnesses for the village to be inherently unbelievable. It therefore accorded no weight to their testimony and held the portion of the order which dealt with the landfill to be against the manifest weight of the evidence. The county and the village appealed to this court, and we allowed the appeal. 87 Ill. 2d R. 315.

### I. Was the Circuit Court Order Internally Self-Contradictory?

We disagree with the appellate court's conclusion that the circuit court order is internally self-contradictory. The circuit judge was being asked to make two decisions based on distinct but remarkably similar criteria. He dealt first with the requested change from single-family residential to restricted industrial and open-space zoning. Concluding that this change was proper, he turned to the second question, whether a special-use permit should issue for the interim use as a sanitary landfill. The lengthy oral presentation of findings on overlapping criteria was obviously difficult to follow. This does not, however, mean that the findings are internally inconsistent.

Zoning ordinances, which must bear a reasonable relation to the public health, safety and welfare, are presumed valid. The party challenging the zoning bears the burden of proving by clear and convincing evidence (*National Boulevard Bank v. Village of Schaumburg* (1980), 83 Ill. 2d 228; *Exchange National Bank v. County of Cook* (1962), 25 Ill. 2d 434, 439-40) that application of the ordinance to his property is unreasonable and arbitrary and bears no substantial relation to public health, safety, morals, or welfare. (*Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172; *County of Cook v. Priester* (1976), 62 Ill. 2d 357; *La Salle National Bank v. City of*

*Evanston* (1974), 57 Ill. 2d 415.) A party seeking a special-use permit bears a similar burden. (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 110, *disapproved on other grounds in Board of Education v. Surety Developers, Inc.* (1975), 63 Ill. 2d 193.) Therefore, the circuit judge in this case was required to determine separately whether Sexton had met its burden on each of the two questions.

When the circuit judge considered the evidence relating to the requested change from R—4 to P—2 and I—1 zoning he was guided by the standards announced in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47. These include (1) the existing uses and zoning of nearby property, (2) the extent to which property values are diminished by the particular zoning restrictions, (3) the extent to which the destruction of plaintiff's property values promotes the health, safety, morals, or general welfare of the public, (4) relative gain to the public compared to hardship imposed upon the individual property owner, (5) the suitability of the subject property for the zoned purposes, and (6) the length of time the property has been vacant as zoned, considered in the context of land development in the vicinity. The circuit judge concluded that, with respect to each of these six factors, Sexton had shown that the R—4 zoning was arbitrary, capricious and unreasonable, as was the denial of the request to rezone the property to P—2 and I—1.

Next the judge turned to the separate question of the special-use permit for the sanitary landfill. He once again considered the six *La Salle National Bank* factors as they related to this question and, in addition, the six special-use standards established by the Cook County zoning ordinance. Those six standards are:

"1. That the establishment, maintenance, or operation of the special use will not be detrimental to or endanger the public health, safety, or general welfare.

2. That the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood.

3. That the establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district.

4. That adequate utilities, access roads, drainage and/or other necessary facilities have been or are being provided.

5. That adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets.

6. That the special use shall in all other respects conform to the applicable regulations of this Ordinance and other applicable County regulations, except as such regulations may in each instance be modified by the Board of Commissioners pursuant to the recommendation of the Zoning Board of Appeals." 1976 Cook County Zoning Ordinance sec. 13.10—F.

To obtain a special-use permit, an applicant must satisfy all six of these standards. In this case, the trial judge discussed each standard and found that standards (3) through (6) had been met. Referring to the second standard, the judge said both that "there has been no substantial diminution and impairment of property values within the neighborhood" and also that "this Court cannot say that the use of this property as a sanitary landfill will not be injurious to the use and enjoyment of other property in the immediate vicinity, to wit, the Village of Richton Park." Sexton argues that these two statements are inconsistent and that the latter is also inconsistent with the finding on standard (3) that "it does not appear to me from all of the evidence that the existence of this landfill site seriously impacted or prevented the development of the residential property within the

Village of Richton Park."

Similarly, with regard to the first standard the judge said, "I do believe, and I so find, that the operation of this special use sanitary landfill will not endanger the public health, safety, or general welfare. But I cannot say that Sexton has shown, by a clear preponderance of the evidence, that this special use as a sanitary landfill will not be detrimental to the public health, safety, or general welfare." Sexton argues that the findings with respect to endangerment and detriment are self-contradictory and that since the judge found no endangerment, his inability to find no detriment is inconsistent and must therefore be disregarded. The appellate court agreed, but we view the findings differently.

Zoning is primarily a legislative function (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415). In the construction of a zoning ordinance, "[e]ffect should be given to the intention of the drafters by concentrating on the terminology, its goals and purposes, 'the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance.'" (*Pioneer Trust & Savings Bank v. County of Cook* (1978), 71 Ill. 2d 510, 520.

It is a fundamental rule of statutory construction that surplusage will not be presumed, and each word, clause, or section must be given some reasonable meaning, if possible. (*People v. Warren* (1977), 69 Ill. 2d 620, 627; *Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 466; *Hirschfield v. Barrett* (1968), 40 Ill. 2d 224, 230, *cert. denied* (1969), 393 U.S. 1062, 21 L. Ed. 2d 706, 89 S. Ct. 716.) The Cook County board of commissioners established six special-use standards, and we must give meaning to each one. If we were to adopt Sexton's suggestion and construe "development" as equivalent to either "use and enjoyment of

other property" or "substantially diminish and impair property values" we would render one of the standards meaningless. This could not have been the legislative intent. Similarly, where a standard is two-pronged, we attribute a distinct and independent meaning to each prong. Use of the word "nor" in the second standard indicates the legislative intent to give separate meanings to "use and enjoyment of property" and to "property values" and to prohibit interference with either. Similarly, use of the word "or" in standard (1) indicates that "detrimental" and "endanger" have separate meanings. *Cf. Campbell v. Prudential Insurance Co. of America* (1958), 15 Ill. 2d 308; *People v. Vraniak* (1955), 5 Ill. 2d 384, 389-90.

Because the words have distinct meanings, it must be logically possible to reach a positive result with respect to one and a negative result with respect to the other. The circuit judge understood this when he made separate findings on each of the special-use standards. Although we do not challenge his finding that the operation of the sanitary landfill did not substantially diminish and impair property values within the neighborhood for the reasons explained above, we do not regard it as inconsistent with his findings that he was unable to conclude that a landfill would not be detrimental to the public health, safety or general welfare and injurious to the use and enjoyment of homes in Richton Park. Although the oral pronouncement may not have been a model of clarity, it was not internally inconsistent, and it cannot be voided on that ground.

## II. Was the Testimony of the Richton Park Residents Inherently Unbelievable?

Next we address the question whether certain testimony was inherently unbelievable and therefore entitled to be given no weight. (*Kuehne v. Malach* (1918), 286 Ill.

120.) Unless it is inherently unbelievable, uncontradicted testimony is not to be disregarded. (*Kelly v. Jones* (1919), 290 Ill. 375, 378; *People v. Davis* (1915), 269 Ill. 256, 270-71.) The trier of fact who observed the demeanor of the witnesses was best able to judge their credibility and to determine how much weight to give their testimony. (*Kelly v. Jones* (1919), 290 Ill. 375, 378.) On the record before us, we should not substitute our judgment for that of the trier of fact.

The testimony in question was provided by five individuals who reside in the Lakewood subdivision of Richton Park across I-57 to the east of the landfill. They testified to various sorts of interference with the use and enjoyment of their property. There was no reason to believe that any of this testimony was fabricated, exaggerated, or in any way inconsistent with ordinary experience.

Each resident testified regarding the offensive odors produced while the landfill was operating, odors perceptible from the residents' yards and, in some instances, within their homes, whenever the wind blew from the west. The odors were described as "rotten, moldy, putrid smells," "stunk like rotten garbage," "like old garbage," "frequent putrid odors." Since the garbage dump has been closed down, the residents still smell similar odors, but not as frequently. There was additional testimony from other witnesses regarding similar odors emanating from other landfills operated by Sexton and located near Oakbrook and in Blue Island.

In addition to odors, the Richton Park residents testified about visual blight. At least two of them were able to see parts of the landfill from their homes. They also complained about blowing debris which littered Sauk Trail and caught in their fences and about rodents in the area. One of the women, who worked at a day-care center about 1½ blocks from the landfill site, testified that

garbage was blown into the day-care center while the landfill was operating. It was the duty of the trier of fact to evaluate this testimony and to decide how much weight to give it.

It does not take an expert to establish that garbage has an unpleasant odor. All that Sexton's witness, Mr. Daniels, could say when he was asked if the smell was pleasant was that it depends whether "you make your money that way." This acid remark can hardly be considered evidence that the garbage in fact did not smell bad.

The appellate court erred when it concluded that the evidence was uncontested that the prevailing winds were away from the Lakewood subdivision. To the contrary, both a witness, Richton Park village planner Dudley Onderdonk, and a report from Argonne National Laboratory indicated that prevailing winds were from the west to the east throughout the year and, in particular, from the northwest to the southeast, *i.e.* toward the Lakewood subdivision, during the winter months. During all seasons there are wind shifts and the wind blows from all directions some of the time. The witnesses noticed the odors more during the summer because they were outside or were likely to have had their windows open more often when the weather was warm except for times when they turned on air conditioning to insulate themselves from the odors.

The appellate court distorted the testimony when it stated that the residents could obtain "relief" by turning on their air conditioning. Only two residents mentioned air conditioning, and those who did were complaining. It would be presumptuous to expect these homeowners to purchase and use air-conditioners in order to make their homes habitable. In a time of conservation consciousness and rising energy costs, many people would agree with the resident who resented the additional expense as well as energy use which air conditioning entails.

The appellate court insinuates that the witnesses must have fabricated their testimony because it somehow conflicts with "objective" testimony that real estate values did not decline while the landfill was in operation. There is no real dispute about the development testimony; the trial court found that development in Richton Park was not impeded by the operation of the sanitary landfill. Sexton's argument, once again, confuses use and enjoyment of property with the separate effect on property values and on land development. Three of the residents testified that they were unaware of the landfill before they purchased their property; yet the problems they later experienced with odor, rodents and garbage were obviously real. On this record, the circuit judge could consistently find that sales in the Lakewood subdivision were not affected by the operation of the landfill, but that use and enjoyment of property by existing homeowners was affected. Although Sexton argues that sales would not have been so brisk had conditions been as the residents described, it is possible both that many prospective purchasers were unaware of the problems until after they purchased and also that many who were aware purchased anyway because the price was attractive. In addition to these witnesses, another 19 individuals with similar complaints were present in the courtroom. Although it is not clear why they did not testify, presumably the reason was that their testimony would have been cumulative. Their presence in such large number lends credence to the complaints of the five individuals who testified.

When it established "development," "property values," and "use and enjoyment" of property as separate criteria to be considered before a special-use permit could be granted for a sanitary landfill, the Cook County board demonstrated the legislative intent to recognize aesthetic as well as economic values. This court has held

that aesthetic considerations cannot be the sole justification for a zoning ordinance, but the fact that a zoning ordinance is partially based on aesthetic concerns does not make it invalid. (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 432; *Trust Co. v. City of Chicago* (1951), 408 Ill. 91, 100; *Neef v. City of Springfield* (1942), 380 Ill. 275, 280.) The six Cook County special-use standards all relate to the public health, safety, morals, and welfare. The standards protect economic interests, but they also protect people. They emphasize the importance both of the dollar value of property and of the more intangible, but equally important, right of one who purchases property to be able to use and enjoy it. A homeowner ought to be able to sit in his home or his yard undisturbed by the ugly sight of burning methane-gas flares or the equally ugly sight of litter on his own and neighboring properties, the health hazards caused by rodents which invade his property despite his best efforts to keep his own property clean, the increased traffic in a quiet residential area which creates an annoyance to him and a real danger to his children, and the unavoidable unpleasant odors which accompany even the best maintained sanitary landfill. Sexton's employees may become accustomed to the odors because they "earn their living that way," but the law should not force citizens of Richton Park to become accustomed to them.

### III. Was the Finding that the Special-Use Criteria Were Not Satisfied Against the Manifest Weight of the Evidence?

A trial court's findings of fact will not be overturned unless they are against the manifest weight of the evidence. (*Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, 15.) We therefore examine the record in this case, part of which has been evaluated above, in light of the circuit court's finding that two of the Cook

County special-use standards had not been met.

Sexton presented four witnesses: a Sexton vice-president, the engineer who designed the Richton Park landfill, a real estate appraiser, and an urban planner who worked on the Cook County comprehensive zoning plan. Cook County and the village presented the five residents of the Lakewood subdivision, a woman who resided near a landfill operated by Sexton·in Oakbrook, three engineers, two city planners, the present and former village presidents, an industrial real estate broker, a field engineer for the Cook County permit division, a real estate appraiser, and the developer of the Lakewood subdivision. Both sides presented a large number of exhibits. These included, *inter alia*, a three-dimensional model of the site after the landfill use terminated, various two-dimensional drawings and renderings, aerial photographs of the area, the comprehensive zoning plans of Matteson, Richton Park and Cook County, various materials presented to the EPA, reports on wind conditions, soil conditions and ground water, and photographs of the landfill site and surrounding area while it was in operation.

The subject property consists of approximately 84 acres. The north portion of the property contains a borrow pit, a large excavation from which earth was taken in order to construct the overpasses for I-57. Much of the property is at various depths below the grade of Central Road. Because the facility was operated as a sanitary landfill for approximately two years, the property now contains large earth mounds, or berms, which were erected around its perimeters in order to shield the landfill operations from view. Despite these berms it is possible to see into the landfill from various points in the Lakewood subdivision and while traveling south on the I-57 expressway. Further, while the berms hide the landfill trenches and work buildings, they do not obscure either

large construction cranes or the methane-gas flares which burn regularly when the landfill is in operation.

In addition to the testimony summarized in section II, the evidence establishes the following: The proposed landfill is planned to contain a total of 10 garbage-filled trenches. The landfill operated for almost two years, six days a week from 7 a.m. until 4 p.m. Refuse from the open garbage delivery trucks would fly off onto the streets. "Fly dumping," the practice of leaving garbage by the side of the road near the Sexton property, also occurred. Sexton hired employees to direct the extra traffic, to show the drivers where to dump refuse, and to clean up the litter created by open trucks and fly dumping.

A sanitary landfill is created by first compacting the refuse and then dumping it into trenches. The garbage is then covered with earthen material and clay sealer. A daily cover is added, and final covering layers are placed atop the garbage to complete each trench. During its two years of operation, two trenches were completed at the site. Sexton plans to fill eight more trenches and estimates that the landfill will operate for approximately eight more years. In Sexton's proposed end-use plans, the land on top of the trenches will be used for parking facilities, and the surrounding area will contain industrial buildings and recreational space such as open parks, ball fields, and hiking, bicycling or jogging paths. There was conflicting testimony regarding whether the property can be developed in its present condition of a partially completed sanitary landfill, whether it could have been developed below grade before the development of the landfill, and what the difference would be in economic impact to Sexton.

There was considerable testimony regarding possible negative effects on the surrounding property. In addition to the testimony of the residents of the Lakewood subdi-

vision, many reports originally prepared for the EPA were admitted into evidence, as were the findings of the EPA. We agree with the circuit judge that this was proper. This is a declaratory judgment action which involves a change from residential zoning and issuance of a special-use permit for a sanitary landfill. Under this court's earlier *Sexton* decision (*County of Cook v. John Sexton Contractors, Inc.* (1979), 75 Ill. 2d 494), the EPA and the zoning authorities in a home rule unit share responsibility for the location of the landfill. This court is not reviewing the propriety of the EPA findings. Neither is this court bound by any EPA findings of fact. Nevertheless, many of the same factors relate to environmental questions as to the zoning and special-use standards, and to that extent the materials submitted are relevant. Questions of the contamination of ground water, the creation of foul odors, littering, traffic congestion, danger of disease created by rodent infestation, and danger of explosion created by methane-gas concentration underground are as relevant to the special-use standards governing the use and enjoyment of property and possible detriment to or endangerment of the public health, safety, or general welfare as they are to environmental concerns.

Considerable testimony was presented regarding the suitability of the sanitary landfill as a garbage-disposal method, including extensive discussion of the various hazards involved, the health and safety precautions which could be utilized, and Sexton's history as an operator of other landfills in the Chicago area. Sexton emphasized the need for garbage-disposal facilities in southern Cook County. While we agree that the evidence supports a general need, the choice of the best location is left to the concurrent jurisdiction of the EPA and the home rule zoning authorities (*County of Cook v. John Sexton Contractors, Inc.* (1979), 75 Ill. 2d 494; *cf. Vil-*

*lage of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill.
2d 1). Further, the record indicates that rapid progress
is being made in garbage-disposal technology. While the
sanitary landfill is an advance over the open dumps of
the past, new methods are being developed which avoid
or reduce the remaining problems of odors, ground-wa-
ter contamination, and rodents. Sexton presented evi-
dence regarding the problems attendant upon the newer
techniques. As always, the trier of fact was best able to
determine which of the conflicting evidence to believe
and how much weight to give it. The record supports the
use of transfer stations to increase the distance between
the garbage source and the ultimate disposal site. Most
important, the record indicates that 15 to 20 miles is a
convenient and economical hauling distance to a sanitary
landfill, and that another landfill currently operated by
Sexton which is 15 miles from Richton Park will remain
open for 12 to 15 years. Since the landfill on the subject
property has been closed, the record reveals no com-
plaints by Richton Park officials or residents regarding
the adequacy of refuse disposal.

Sexton witnesses stress the care with which Sexton
operates its facilities and minimizes problems of odors,
leachate migration and ground-water contamination, ro-
dents, and methane-gas explosions. Sexton also notes
that the EPA approved its site and that while the landfill
was operating, the EPA made unscheduled, monthly in-
spections and never cited Sexton for violations. On
cross-examination, however, Rolf Campbell, a Sexton
witness, admitted that, even in a well-maintained facility,
these problems are hard to control. He did not believe
there were serious problems with the Sexton facility.
Again, the trier of fact was best able to decide what
weight to give the various pieces of evidence.

The Sexton position distorts the legal issue in this
case. The decision whether a special-use permit should

issue is a question which involves a delicate balancing of public and private interests. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40.) When the EPA considered this case, it could properly ask whether Sexton was a good operator, whether sanitary landfills in general were acceptable means of filling the public's need for garbage disposal, and whether Sexton had taken appropriate steps to minimize environmental dangers. Now the focus has shifted. From a zoning standpoint, the question is no longer whether Sexton has minimized the hazards. Even if the circuit judge believes that Sexton has done the best job possible under the circumstances, Sexton, the party seeking the special use, must prove by clear and convincing evidence that the remaining hazards, viewed in terms of the six Cook County special-use standards, do not preclude issuance of a permit for a sanitary landfill at this particular location. In other words, given the known dangers associated with landfills at the current state of the art, is this use compatible with the surrounding uses of the land? Faced with a similar problem in *Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, we concluded that although there was a general need for a hazardous-waste-disposal facility, various factors precluded its location at a particular site near the village of Wilsonville. On the record in this case, the circuit judge could similarly conclude that although there was a need for garbage-disposal facilities in southern Cook County this did not mean that there should be a sanitary landfill just across I-57 from the residential areas of Richton Park.

The trial court must not only look at the past history of landfills and at Sexton's present operating record, but also at difficulties which might develop in the future. (*Jarrett v. Jarrett* (1979), 78 Ill. 2d 337.) Given the nature of decomposing garbage, many of the problems with contamination of ground water, methane gas, and

odors may continue for many years. Although, as the trial judge noted in this case, I-57 would form a natural zoning barrier separating industrial office buildings on the subject property from the single-family residential areas of Richton Park, I-57 is no barrier at all to air and water pollution. The homes in the Lakewood subdivision are only a few blocks from the subject property. Unlike either pedestrian or automobile traffic which require a bridge to cross I-57, it is by purely natural processes that contaminated water seeps under the expressway, odors waft over it, and refuse is blown across it to move in the direction of the short distance to Richton Park.

Most of the sanitary, health and safety problems associated with landfills result from the twin facts that the garbage remains buried in the ground and, as it does so, it decomposes. One of the major dangers is the pollution of ground water by the by-products of this decomposition which are generally known as leachate. Leachate seeps through sand seams in the earth to contaminate the ground-water supplies or aquifers. The natural clay on the subject property is relatively impermeable, as is the clay sealer which is placed over the layers of garbage. On the basis of the evidence indicating both that leachate migration would be slow but that it would inevitably occur over the years and that the Richton Park public water supply is only 3000 feet from the landfill site, the trial judge could conclude that there is no immediate danger to the people of Richton Park, but that the threat to the water supply prevented him from finding by clear and convincing evidence that the landfill was not detrimental to the public health, safety, or general welfare.

Another unwelcome by-product of garbage decomposition is methane gas. Sexton officials testified that, in order to minimize the danger of explosion, the methane must be vented, *i.e.*, allowed to escape into the air and

then be burned off. As many as 50 flares might be necessary at any one time. The flares are visible from the surrounding streets, from I-57, and from Richton Park. While a Sexton employee compared the sight of the flares to the Statue of Liberty, other witnesses complained of visual blight and of the foul odors accompanying the flares, both of which will remain long beyond the eight years for which the landfill is expected to operate. This is because the gas must be vented for several years while the garbage underground continues to decompose. Even with successful venting there is some risk. This risk affects the marketability of the property for industrial purposes as well as its suitability for use as a public park. Again, the record supports the trial judge's conclusions that, even though there is no immediate danger, the evidence is not clear and convincing that the landfill is not detrimental to the public health, safety or general welfare or that renewed operation of the sanitary landfill may not interfere with the use and enjoyment of other property in the immediate vicinity.

Sexton's emphasis on its maintenance procedures raises serious questions about what will occur once the landfill is completed. In addition to the problems of leachate migration and methane gas, the Richton Park residents indicated that foul odors still emanate from the site, even though it is not in operation and even though only two trenches have been completed. Similarly, rodents will continue to be a health hazard when Sexton is no longer operating the site. It is unclear from the record who will be responsible for these conditions once the landfill is closed. Although Sexton seeks eventual zoning for industrial and recreational uses, Sexton plans to operate the landfill for approximately eight years and then to sell the property. A resident living near another site operated by Sexton as a landfill testified that the landfill operation continued for many years beyond the

time that Sexton indicated to her it would, and that Sexton's promised end-use golf course has never materialized. These uncertainties also support the trial judge's conclusion that renewed operation of the landfill may be detrimental to the public health, safety or general welfare and may interfere with the use and enjoyment of property in the immediate vicinity.

Considerable evidence was also provided regarding potential flooding due to the grading and to inadequate drainage from the subject property.

Finally, the trial judge could properly consider the cumulative effect of all of these dangers. Considering the problems of ground water, methane gas, odors, rodents, traffic, and possible flooding, we cannot say that the trial judge's conclusion is against the manifest weight of the evidence. For all of the reasons discussed above, we conclude that the appellate court erred in substituting its own judgment for that of the trier of fact in this case.

Because we affirm the circuit judge's decision that no special-use permit should issue, we must vacate the portion of the order granting the zoning change from R—4 to P—2 and I—1. Zoning is a legislative function. This court has no power to rezone property from one classification to another. (*Reeve v. Village of Glenview* (1963), 29 Ill. 2d 611, 616-17.) This court can set aside a zoning ordinance to the extent necessary to allow a proposed specific use. (*Schultz v. Village of Lisle* (1972), 53 Ill. 2d 39, 42.) Here, the specific use proposed was an interim use as a sanitary landfill; Sexton's end-use plans were contingent on prior completion of the landfill. As there is no longer any acceptable specific use, and even the end-use plan can no longer be achieved, we are not free to allow the rezoning. The judgment of the circuit court is affirmed insofar as it relates to the special-use permit, and vacated as to the zoning change. The decision of the appellate court is accordingly reversed insofar as it re-

lates to the special-use permit and affirmed in other respects.

*Appellate court affirmed in part*
*and reversed in part; circuit*
*court affirmed in part and*
*vacated in part.*