LA SALLE NATIONAL BANK, as Trustee, *et al.*, Plaintiffs-Appellees, v. THE VILLAGE OF BLOOMINGDALE, Defendant-Appellant (William M. Shanahan *et al.*, Intervenors-Defendants).

Second District No. 2—86—0370

Opinion filed April 22, 1987.

Ronald S. Cope and Susan L. Kurland, both of Ancel, Glink, Diamond, Murphy & Cope, of Chicago, for appellant.

James L. Marovitz, Gerald L. Angst, and Holly A. Harrison, all of Sidley & Austin, of Chicago, for appellees.

JUSTICE REINHARD delivered the opinion of the court:

Plaintiffs, La Salle National Bank, as trustee for trust No. 47030, Urban Investment and Development Company, a Delaware corporation and the beneficial owner of trust No. 47030 (Urban), and Zaremba Bloomingdale Company, an Illinois corporation (Zaremba) as the general partner of Bloomingdale Associates, an Illinois limited partnership, the contract purchaser of the parcel of land contained in the trust, brought this declaratory judgment action pursuant to section 2—701 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—701) seeking a declaration that the board of trustees of defendant, the village of Bloomingdale (Bloomingdale), arbitrarily and capriciously denied approval of plans to develop a 15.6-acre parcel of land, currently vacant, into a single-story, three-building retail operation. Homeowners in the residential development, Stratford Estates, which is directly east of this parcel, were allowed to intervene. Following a bench trial, the trial court found that the disapproval of the site plan by the board of trustees was unreasonable and inconsistent with the local zoning ordinance and that the planned use of the property was permitted in accordance with a site plan proposed by plaintiffs. The court enjoined and restrained Bloomingdale from interfering with the proposed development of the parcel and ordered Bloomingdale to issue all the necessary permits for the proposed development.

Defendant raises the following issues on appeal: (1) whether the trial court properly substituted its discretion for that of the board of trustees by failing to uphold the decision of the board of trustees to disapprove the proposed plan of development of the shopping center on parcel D-2; (2) whether the trial court properly determined that plaintiffs succeeded in overcoming the presumption of validity of the board of trustees' decision to disapprove the proposed development by clear and convincing evidence; and (3) whether plaintiffs are entitled to the relief requested because any hardship they will suffer from the disapproval of the site plan was self-created.

The following facts were developed at trial. In 1973, Urban purchased an 875-acre tract of land bordering on the west of a small, but growing, suburban community known as Bloomingdale. Urban intended to develop this tract with a variety of residential and commercial developments over a 10- to 25-year period of time centering on the creation of a large regional shopping mall, Stratford Square. The tract of land is bounded on the south by Army Trail Road and the Illinois Central Railroad, on the north by Lawrence Avenue and part of Lake Street, on the west by Gary Avenue, and on the east

by Indian Lakes Country Club. This became known as the Stratford Planned Unit Development District (Stratford PUD District). The district is illustrated in appendix A.

The Stratford PUD District was annexed to Bloomingdale pursuant to an annexation agreement dated December 20, 1973. As part of the annexation agreement, Bloomingdale enacted Ordinance 73–69, a special ordinance to govern planned unit developments of 250 acres or more (PUD ordinance). A planned unit development district, unlike traditional zoning districts, specifically permits both residential and commercial uses within the district if the uses are designed to be compatible with the other uses in the district. Because of the difficulty of predicting the exact nature and pattern of development, the PUD ordinance allows for the flexibility necessary to develop a large tract of land over an extended period of time while continuing to allow the municipality to protect the interests normally protected through general zoning provisions. The parties agree that the PUD ordinance applies to the subject property. The PUD ordinance sets forth the regulations for the entire district, including specific building requirements for light, use, air, and bulk of each proposed development. It also includes explicit standards which shall guide the planning commission and the board of trustees in the exercise of their reasonable discretion when determining whether to grant or deny approval of any plan for development in the district. If the proposed plans are in conformity with these standards, the ordinance also provides that the plans shall be approved.

Pursuant to the PUD ordinance, Urban developed, and Bloomingdale approved, a tentative development plan which divided the 875-acre tract into two land use regions: a business land use region and a residential land use region. Wheaton Road, a north-south highway, divides the two regions. Urban also designated the percentages of residential and commercial development which could occur in the two regions. In the business land use region, a maximum of 100% commercial could be developed with a minimum of 35% commercial and a maximum of 65% residential and minimum 0% residential. In the residential land use region, a maximum of 90% residential and a minimum of 60% residential and a maximum of 40% commercial and a minimum of 10% commercial could be developed. In 1979, however, pursuant to Urban's request, Bloomingdale amended the tentative development plan to permit the development of a maximum of 97% residential and a minimum of 3% commercial in the residential land use region.

Urban also designated other prospective land uses in the district

as municipal, school, water retention, public park sites, and divided the entire district into eight neighborhoods. The parcel subject to this action is in neighborhood D, which was later divided into two parts: D-1 and D-2. This plan was updated periodically although Bloomingdale was never required to adopt a new tentative plan, and the updated plans never varied much from the original. Urban referred to the plan as reflecting its present intention with regard to future development.

The testimony and exhibits show that the following development has taken place in the Stratford PUD District: in the business land use region: (1) the Stratford Square Shopping Center west of Wheaton Road; (2) the Herman's Shopping Center, Amlings Flowerland, Red Lobster, Children's World, and office buildings along the north side of Army Trail Road and west of Wheaton Road; (3) south of Army Trail Road and west of Wheaton Road, the Western Development Fashion Center and Toys-R-Us; (4) along the northwest perimeter of the Stratford Square Shopping Center at Schick Road and Gary Avenue is Merchant's Park, which contains a Pearle Vision Center, Meriwethers, Burger King, a car wash, and McDonalds; and in the residential land use region: (1) on the parcel D-1, which fronts along the north side of Army Trail Road and Butterfield Drive, are 36 single-family homes; (2) at the northeast quadrant of Army Trail Road and Wheaton Road, on the parcel D-2, is a bank. Urban has designated the area immediately to the north of parcel D-1 as a school site with a park site adjacent to its northern boundaries. Thus far, only 2% of the residential land use region has been developed as commercial.

The property which is the subject of this declaratory action is a 15.6-acre parcel located in parcel D-2 bounded by Army Trail Road, a four-lane major highway through Du Page County, on the south; by Wheaton Road, also a four-lane highway, on the west; by Butterfield Drive, a two-lane residential road, on the east; and by a water detention area to the north. The only development presently on parcel D-2 is a bank on the southwest corner. The proposed development is a shopping center with Builder's Square as the anchor tenant. The shopping center would consist of two principal buildings with a third, smaller building fronting on Wheaton Road. The site plan contemplates that the buildings will accommodate five retail tenants. The shopping center has a gross building area of 177,876 square feet, and Builder's Square would occupy 87,000 square feet. The site also contains 680 parking spaces and is illustrated in appendix B.

Builder's Square is a home-improvement retail operation, which

is described as a heavy commercial use. It is a seven-days-a-week use which is intended to draw its customers on a regional basis and is designed to serve the building trades. It would open at 7 a.m. in order to accommodate the building trades and close at 10 p.m. on weekdays and at 5 p.m. on the weekends. Products sold by Builder's Square include lumber, plumbing and electrical supplies, garden and hardware supplies, and other building materials. Truck deliveries could be made at off-peak hours during the day and at the rear of the store.

The site extends 418.95 feet along Army Trail road, 771 feet along Wheaton Road, and 1083.94 feet along Butterfield Drive. The proposed buildings are situated on the northeast perimeter of the site along Butterfield Drive and the northern boundary of parcel D-2. The buildings extend almost the entire length of the parcel along Butterfield Drive and would be approximately 20 feet high. The principal access will be Wheaton Road, with additional access from Army Trail Road. There is no proposed access from Butterfield Drive.

Immediately to the east of the parcel across Butterfield Drive on parcel D-1 is Stratford Estates, a residential subdivision. It is a 20-acre parcel which contains 36 single-family homes in the $150,000 price range. Urban, representing its wholly owned subsidiary, United Development Company, sought and received plan approval from Bloomingdale to develop the Stratford Estates subdivision in the summer of 1977. The only access to this area is from Butterfield Drive. East of the Stratford Estates is Indian Lakes Estates, also containing single-family homes, which is not part of the Stratford PUD District. To the northeast of parcel D-2 is the Indian Lakes Country Club.

In order to buffer the shopping center from Stratford Estates, plaintiffs propose to erect a 1,083.94-foot berm running along Butterfield Drive. The berm is to be 10 to 12 feet high, planted with trees approximately 40 to 50 feet high and shrubbery of up to 20 feet high, and is to be approximately 50 to 80 feet wide. This landscaping is anticipated to screen the buildings from the line of sight of residents of Stratford Estates.

South of Army Trail Road and east of Wheaton Road is a tract of land known as the Mel Simon property. The Mel Simon tract was recently annexed to Bloomingdale, but not until after the denial of the proposed shopping center here. Prior to Bloomingdale's annexation of this tract, it was zoned for industrial use in Du Page County. Plans for development, including a Mr. HOW store, a use similar to Builder's Square, have been approved for the property by

Bloomingdale. The approved site plan indicates that the Mr. HOW store would be set back 800 feet from Army Trail Road. The uses approved for this site are in accord with the uses which have been designated for the area in Bloomingdale's Official Comprehensive Land Use Plan. This site is not part of the Stratford PUD District and is not covered by the PUD ordinance.

In early February 1985, Urban requested approval of its preliminary and final plans for the proposed development on parcel D-2. A hearing was held before the Bloomingdale plan commission, which approved the plan three votes to two with two members absent. The plan was then submitted to the board of trustees for approval. The record on appeal, however, does not contain a transcript of either of these proceedings. While it is not clear what evidence was presented to the plan commission or the board of trustees, the commission did have the reports from the various Bloomingdale department heads concerning their review of the preliminary plan for development of the shopping center and their suggested changes. The suggested modifications were apparently incorporated into the plan. These included both landscaping modifications increasing the shrubbery on the berm and architectural modifications removing all exposed structures from the back of the buildings, enclosing all trash receptacles, and lowering the height of the building.

On April 22, 1985, the board of trustees disapproved the plans. As required by the PUD ordinance, Bloomingdale notified plaintiffs in writing of the reasons for its decision by letter dated May 13, 1985, which stated, in pertinent part, that the owner of the property had established the nature of the area by encouraging and permitting the construction of single-family homes which precluded the proposed use of the parcel at the intensity level proposed; that the use of a berm and the existence of a street between the residences and the proposed commercial use did not create a sufficient buffer zone between low-intensity residential and high-intensity commercial; that good planning requires transitional uses on the parcel rather than the unnatural placement of a commercial operation of the highest intensity directly next to residential property; that a 700-foot-long brick wall directly adjacent to the single-family area, the outdoor storage of building materials, and the expected litter and refuse from a lumber yard and building supply operation all indicated an incompatibility with the area; and that there were a great many residential or commercial uses available for this property which would not bring such a high-intensity commercial use to the area.

Each side also presented testimony at trial on the effect the pro-

posed commercial development would have on the area. Briefly summarized, it is revealed that James Barnett, a real estate manager with Zaremba, testified for plaintiffs that the proposed commercial operation would be a first-class retail center and Zaremba would ensure that the tenants complied with the very strict rules for operation Urban mandated would apply to any development in the Stratford PUD District. Barnett stated that he has managed similar shopping centers, although he never managed a center which contained a Builder's Square.

Rolf C. Campbell, a city planning and zoning consultant for 35 years and a certified land planner, testified for plaintiffs that the trend of development along Army Trail Road is toward commercial. He was of the opinion that Builder's Square is an appropriate use for this area, that the proposed plan is sufficient to protect the health and safety of the area, that the proposed use is in accord with the surrounding uses, that single-family residences are compatible with Builder's Square, and that the site is fully suited for the shopping center as planned. Campbell considered the current uses along Army Trail Road and across parcel D-2 as well as the homes adjacent to the parcel. He also felt that the area along Army Trail Road has been developed with an emphasis on more intense kinds of service-oriented businesses.

William A. McCann, a real estate appraiser, testified for plaintiffs that the trend of development in this area is toward commercial use and appraised the vacant parcel if developed with low-density housing at $900,000, while he appraised it if developed as planned at $2,700,000. He also stated that the adjoining homeowners would not suffer a depreciation in property value as a result of this planned proposed use and, in fact, noted a slightly higher appreciation of home value in close proximity to commercial developments, and that the proposed use is reasonable and geographically and economically appropriate. McCann also produced photographs of areas which combined commercial and residential uses to demonstrate that it was not uncommon to develop an area as proposed by Urban. While he stated that he considered Builder's Square as the anchor tenant in reaching his appraisals, McCann was only generally familiar with the operations of a Builder's Square and the types of uses it posed. He felt that the development would not affect the character of Stratford Estates, would stabilize the area, and would enhance the value of the residential property.

Michael Levin, vice-president of Urban and the manager of development of the Stratford PUD District from 1981 to 1984, testified

regarding the history of the Stratford PUD District, explained the plans and expectations of the proposed retail shopping complex anchored by Builder's Square on the parcel as well as the strict rules of tenancy and operations in the complex, and elaborated on the procedures and steps Urban undertook to develop and submit the plans to Bloomingdale. In particular, Levin pointed out that the tenants would be required to adhere to more stringent standards of design and operation than are set forth in the PUD ordinance, including regular refuse pick-up, sidewalk cleaning, landscape maintenance, no outside storage, an enclosed sales area, and no exterior display of materials. He stated that United Development Company owned both parcel D-1 and parcel D-2; however, in 1984, United, which was sold by Urban in 1981, defaulted on its note to Urban which, instead of foreclosing, simply took back the property from United. Levin emphasized that Urban went to great lengths to ensure that the proposed site plan was aesthetically pleasing and would not be harmful to the health, safety, and welfare of the surrounding areas.

The intervenors called several homeowners in the Stratford Estates, all of whom testified that they felt the commercial development with Builder's Square as an anchor tenant would have a negative effect on the values of their homes, although they felt that the proposed development south of Army Trail Road would not negatively impact their property like Builder's Square. They also stated that when purchasing their homes, they were led to believe that the vacant property west of their homes was to be developed as "future residential" property and not as commercial property.

Leslie Pollack, a city planning and zoning consultant, testified for Bloomingdale that the proposed plan would serve to make the two-lane Butterfield Drive a separator, not a collector as was its design, that the proposed berm would be nothing more than an unbecoming earthen wall and could develop into a condition dangerous to children, that the proposed development would create an unnatural environment, that this would encourage further commercial development on the east side of Wheaton Road in the residential use region, that the area was much better suited for greater density residential development or multifamily housing, and that a Builder's Square, although a permitted use, is not a compatible use with the single-family housing presently in the area. Good planning standards required gradation of uses for the area.

Thomas Collins, a real estate appraiser for 30 years in the Bloomingdale area, testified that Builder's Square's operations would have a negative effect on the single-family homes presently in the

area. In particular, he noted that the proposed use would cause a 10% reduction in value of the property in Stratford Estates.

In rendering its decision, the trial court emphasized that this case was not a traditional zoning decision and, as such, was not subject to the same standard of review. The court found, in pertinent part, that the evidence was clear that the site plan conformed to the standards and regulations set forth in the PUD ordinance, that the board of trustees' refusal to grant site plan approval was contrary to the PUD ordinance and unreasonable and inconsistent with the PUD ordinance, and that the residential property will not suffer substantial injury.

In arguing post-trial motions, Bloomingdale explicitly raised the question of what standard of review the trial court applied in rendering its decision. The trial court stated that it had afforded a presumption of validity to the decision of the board of trustees and that plaintiffs proved their case by clear and convincing evidence.

■ Initially, we must consider Bloomingdale's pending motion to dismiss the appeal on the ground of mootness. The motion asserts that on information and belief Bloomingdale believes that Builder's Square has entered into an agreement with Zaremba whereby Builder's Square will not be a tenant in the proposed development. At oral argument, counsel for plaintiffs represented that while the agreement with Builder's Square to occupy space in the proposed development had expired, a new agreement for occupancy could still be negotiated with Builder's Square upon completion of this appeal and, in any event, they were not precluded by the trial court judgment from entering into a contract with another tenant for the Builder's Square site that would use the proposed building and site plan for the same type of use approved by the trial court. Under these circumstances, there still is an actual controversy involving the rights of the parties, and we must address the merits of this appeal. The motion to dismiss the appeal is denied.

Bloomingdale first contends that the trial court improperly substituted the exercise of its discretion for the discretion of the board of trustees because the board was entitled by the PUD ordinance to exercise its reasonable discretion in determining whether to approve plaintiff's proposed plan to develop parcel D-2 as a shopping center with Builder's Square as the anchor tenant. It argues that the language of the PUD ordinance specifically reserves to the board of trustees the power to exercise its reasonable discretion in approving site plans for development within the Stratford PUD District and that the decision of the trial court, which, in essence, determined

that the board of trustees' review of the plan was merely ministerial, is contrary to the language of the PUD ordinance.

Plaintiffs respond that, unlike traditional zoning decisions, site plan review is ministerial in nature and the decision in this regard is not entitled to the same judicial deference as is often seen in constitutional challenges and that the board of trustees' decision must be overturned if not supported by substantial evidence. Plaintiffs contrast this case to decisions by municipal authorities regarding the issuance of a special use permit after they determined that a nonconforming use is found desirable for the area. The plaintiffs argue that the PUD ordinance differs because the meaning and intent of the ordinance is to allow flexibility in development, only leaving the board of trustees with the sole function of determining whether plaintiffs' site plan conforms with the good planning standards as set forth in the PUD ordinance.

■ Initially, we note that the primary rule of construing ordinances is to ascertain and give effect to the intention of the legislative body. (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 313, 469 N.E.2d 183; *Levitt Homes, Inc. v. Old Farm Homeowners' Association* (1982), 111 Ill. App. 3d 300, 311, 444 N.E.2d 194.) It is fundamental that surplusage will not be presumed, and each word, clause, or section must be given a reasonable meaning. (*Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 313, 469 N.E.2d 183.) A review of the PUD ordinance indicates that the ordinance reserves for the board of trustees, not the developer, the power to legislate zoning controls without the difficult guidelines normally accompanying traditional zoning ordinances and sets forth a procedure for approval of developments in the Stratford PUD District aimed at protecting the interests of the residents of Bloomingdale. See *Levitt Homes, Inc. v. Old Farm Homeowners' Association* (1982), 111 Ill. App. 3d 300, 312, 444 N.E.2d 194.

■ Examining the applicable standard of review, it is clear that this is not an action challenging the constitutionality of a zoning ordinance, which is not an administrative review of an agency decision but a separate review based on independent evidence (*cf. Zebulon Enterprises, Inc. v. County of Du Page* (1986), 146 Ill. App. 3d 515, 520, 496 N.E.2d 1256), and it is not an action seeking review of an administrative decision of a board of appeals established pursuant to division 13 of the Municipal Code of 1961 (Ill. Rev. Stat. 1985, ch. 24, par. 11—13—3), because Bloomingdale, through the PUD ordinance, did not establish a zoning board of appeals which would have

transferred to an administrative agency the authority to administer the ordinance (see Ill. Rev. Stat. 1985, ch. 24, par. 11–13–13; *cf. Hammond v. City of Chicago* (1985), 139 Ill. App. 3d 98, 487 N.E.2d 87). Instead, the power to administer the ordinance remained with the board of trustees, and the board's decision should therefore be considered a legislative act and not an administrative act. *Cf. Knor v. County of Madison* (1986), 151 Ill. App. 3d 767, 772-73, 502 N.E.2d 1063; *Smith v. County Board* (1980), 86 Ill. App. 3d 708, 714-15, 408 N.E.2d 452.

■ As a result, it is not the function of the trial court to simply review the findings and conclusions of the board of trustees as if the board were an administrative agency to determine if its decision was against the manifest weight of the evidence (*cf. Hammond v. City of Chicago* (1985), 139 Ill. App. 3d 98, 487 N.E.2d 87), but should review the findings and conclusions as a legislative decision carrying with it a strong presumption of validity which can only be overcome by clear and convincing evidence demonstrating that the application of the ordinance is unreasonable and arbitrary and bears no substantial relation to public health, safety, morals, or welfare. (See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 310-11, 469 N.E.2d 183; *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 307-08, 388 N.E.2d 388; *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80, 354 N.E.2d 899; *Family Christian Fellowship v. County of Winnebago* (1986), 151 Ill. App. 3d 616, 618-19, 503 N.E.2d 367.) In addition, as it is the trier of fact who observed the demeanor of the witnesses and is best able to judge their credibility and to determine how much weight to give their testimony, a reviewing court should not substitute its judgment for that of the trier of fact unless the decision is against the manifest weight of the evidence. See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 315, 469 N.E.2d 183; *Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516, 532-33, 449 N.E.2d 69; *La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 309, 388 N.E.2d 388.

■ Contrary to Bloomingdale's contentions, the trial court specifically stated when denying the post-trial motions that it afforded the board of trustees' decision a presumption of validity. The court also stated that it was clearly convinced by the evidence that the board of trustees abused its discretion. The trial court was correct in applying this standard of review, and it is now for this court to determine whether the decision of the trial court finding that plaintiffs established an abuse of discretion by the board of trustees in deny-

ing approval of the site plan by clear and convincing evidence is against the manifest weight of the evidence.

Bloomingdale next contends that the trial judge erred by failing to uphold the decision of the board of trustees because plaintiffs failed to meet their burden of proof. In particular, it argues that the decision of the board disapproving the site plan is entitled to a presumption of validity and that plaintiffs failed to prove by clear and convincing evidence that the decision was an abuse of discretion. Plaintiffs, on the other hand, contend that even if the board of trustees' decision is entitled to a presumption of validity, the evidence clearly and convincingly demonstrates that the site plan complied with the standards set forth in the PUD ordinance, that the decision of the board was contrary to the evidence and an abuse of discretion, and that the decision of the trial court is not against the manifest weight of the evidence. Plaintiffs argue that the evidence demonstrates that there is no indication of any detriment to the public health, safety and welfare. In essence, Bloomingdale argues that the site plan fails to conform to the standards of the PUD ordinance, while plaintiffs argue that the site plan conforms to the standards of the PUD ordinance.

■ As previously noted, the decision of the board of trustees is entitled to a presumption of validity. (*Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516, 531, 449 N.E.2d 69; *Family Christian Fellowship v. County of Winnebago* (1986), 151 Ill. App. 3d 616, 619, 503 N.E.2d 367.) This presumption is overcome, however, when it is shown that there is no reasonable basis for the decision (see *Westfield v. City of Chicago* (1962), 26 Ill. 2d 526, 531, 187 N.E.2d 208) by clear and convincing evidence (see *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 310, 469 N.E.2d 183; *Tomasek v. City of Des Plaines* (1976), 64 Ill. 2d 172, 179-80, 354 N.E.2d 899). The burden of overcoming this presumption is on the party challenging the decision. See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 310, 469 N.E.2d 183.

The designed purpose of the PUD ordinance is included in the ordinance and states, in part:

"[T]o set forth specific additional standards and exceptions to govern the recommendations of the Plan Commission and the action of the Board of Trustees with respect to granting approvals *** [and] are designed to provide for an integrated development considering all the elements of good land planning so as to provide an adequate relationship between structures and land uses; while at the same time providing for adequate space, light, air, use and bulk limitations, to promote the

health, safety, and welfare of the Village and its residents."
The ordinance also states, in part, that in granting or withholding approval of site plans, the plan commission and the board of trustees shall be guided in the reasonable exercise of their discretion by the following standards:

"(a) All plans shall be so designed that the public health, welfare and safety will be protected.

(b) The proposed development of the District shall be such that it does not cause substantial injury to the value of other property in the neighborhood.

(c) All plans shall provide for protection of both aesthetics and function of the natural environment, which shall include, but not be limited to, conditions pertaining to flood plains, soil and geologic characteristics and preservation of vegetation.

(d) All plans shall provide for and insure the preservation of adequate and permanent open space.

(e) Residential use areas shall have a variety of housing types and densities necessary to achieve a balanced neighborhood.

(f) The District shall include land area necessary to accommodate cultural, educational, recreational and other public and quasi-public activities necessary to serve the needs of the residents thereof.

(g) The proposed development of the District shall provide for the orderly and creative arrangement of all land uses with respect to each and to the entire Village.

(h) The proposed development of the District shall provide for developed recreational activity areas necessary to serve the needs of the residential portion of the District.

(i) The Plan Commission and the Board of Trustees need not approve any Preliminary Plan or Final Plan which deviates from the Tentative Development Plan where such deviation results in:

(i) A change which alters the concept, character or intent of the overall development as set forth in the Tentative Development Plan or any Preliminary Plan; or

(ii) A change which would ultimately adversely affect the capacity of the public utilities then presently intended to be constructed by or for the Village, unless the developer agrees to eliminate any such adverse affect without cost to the Village over and above the cost to have been incurred by the Village, if any, prior to such change."

In addition to these standards, the plan commission or the board of trustees may disapprove such plans if, in their reasonable discretion, such plans fail to provide a satisfactory relationship between different types of residential units within the area as well as those existing or proposed in any adjacent area, fail to reasonably provide and locate recreational areas within the area, fail to provide a useable and safe network of public and private roads, fail to be in accordance with good planning principles recognized by professional planners to design a liveable and healthful modern environment within the standards. It also provides that disapproval of any plans may not be for reasons which are inconsistent with the standards provided in the PUD ordinance and if a plan is in conformity with good planning standards, it shall be approved. It is clear that review of a developer's proposed site plan is more than ministerial. It is the board of trustees and not the developer which must determine whether a proposed site plan conforms with good planning standards.

The parties extensively argue in their appellate briefs that the evidence presented to the trial court reflected favorably on their positions. Each side produced expert testimony concerning the economical and aesthetic effect the shopping center, with Builder's Square as the anchor tenant, will have on the surrounding area and the suitability of the center on this particular parcel of land. Bloomingdale argues as favorable to its position the fact that the proposed commercial use is incompatible with the residential use already existing in the area, would cause a 10% reduction in the value of Stratford Estates property, and is too intense a use for the area and that the proposed berm does not constitute a sufficient buffer between the two areas, will not sufficiently screen out the noise and pollution from the warehouse-type use, and will likely be a danger to children playing on it. Plaintiffs, on the other hand, note that the proposed plan is designed to protect the health and safety of the area, will not cause substantial injury to the surrounding property, protects the aesthetics of the natural environment, is an orderly and creative arrangement of land uses in the area, does not alter the character of the tentative development plan, and is in conformity with the good planning standards.

Our review of the record indicates that the proposed site plan does comply with some of the standards of the PUD ordinance. For example, the site plan was designed to protect the public health, safety, and welfare. The plan complies with all applicable fire, building and zoning requirements, presents no potential traffic problems for the area, and provides minimal visual and sound screening from

the residential area adjacent to the parcel. The plan is generally aesthetically adequate. The buildings are to be built with face brick, no exposed structures on the back of the buildings, and masonry-enclosed trash receptacles. The berm is to have a natural appearance, with a variety of trees and shrubbery planted on it. Good planning is somewhat demonstrated by backing the proposed structure to Stratford Estates and prohibiting access to the site from Butterfield Drive. The presence of commercial use is in keeping with the trend toward commercial development of Army Trail Road.

On the other hand, the evidence also establishes that the presence of such an intense commercial use as proposed would cause substantial injury to the value of the homes in Stratford Estates. The types of buildings in the commercial use proposed obviously are not balanced with the types of homes in Stratford Estates. It is evident that these homes were developed beginning in 1983 and the subject parcel was in the residential land use region directly across from these residences, separated only by the two-lane road of Butterfield Drive. While the PUD ordinance does not preclude plaintiffs from placing a commercial use within the residential land use region, the proposed use must fit with the residential character of the neighborhood. This proposed use does not.

The public health and safety may eventually be endangered by the presence of such an intense commercial use so closely situated near homes, a proposed school site, and a water detention facility. The presence of Builder's Square also is not a creative arrangement of all land use and generally alters the character of the overall development of the area. The buildings are not planned to front along Army Trail Road and will extend over 1,000 feet into the residential use region. The two-lane road and the proposed berm do not appear to buffer sufficiently the residential use from the commercial use. The only current use on the parcel is a bank on the northeast corner of the parcel which is a minimal commercial use found compatible with the area. The development on the nearby Mel Simon property is not a fair comparison because it is sufficiently buffered from Stratford Estates as it will be set back on the property 800 feet, and it is separated by a four-lane major highway, while the proposed development will be much closer to Stratford Estates and only separated by a two-lane road.

The board of trustees determined that the proposed use, including the presence of Builder's Square, did not comply with the good planning standards of the PUD ordinance and that the proposed use was incompatible with the area. It did not preclude all commercial

use, but simply determined in the reasonable exercise of its discretion that the proposed use, as presented, did not comply with the PUD ordinance. In the past, the board of trustees had approved the planned developments for multifamily housing on the subject property which were not developed.

■■ ■ Generally, no one factor is controlling; each zoning decision must be determined on its own facts and circumstances, and where there is a difference of opinion, the decision should remain with the municipality. (*Cf. La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-48, 145 N.E.2d 65; *La Salle National Bank v. City of Chicago* (1955), 6 Ill. 2d 22, 29-31, 126 N.E.2d 643.) While both sides presented an extensive amount of evidence, the burden below remained with plaintiffs to establish by clear and convincing evidence that the board of trustees abused its discretion in finding that the proposed site plan did not conform to the good planning standards set forth in the PUD ordinance. (See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 310, 469 N.E.2d 183.) As such, we conclude that plaintiffs did not present sufficient evidence to overcome their burden to demonstrate clearly that the decision of the board refusing to approve the specific use presented to it was an abuse of discretion and that the finding of the trial court is against the manifest weight of the evidence. In view of this decision, we need not address Bloomingdale's final issue where it contends that plaintiffs are not entitled to any requested relief because any hardship they will suffer from the disapproval of the site plan was self-created by the past decision to develop the immediate area for residential use.

As stated above, the trial court's decision finding that the evidence clearly and convincingly established an abuse of discretion by the board of trustees in refusing to approve the proposed site plan is against the manifest weight of the evidence because the evidence was insufficient to demonstrate that the proposed use conforms to the good planning standards set forth in the PUD ordinance.

For the foregoing reasons, the decision of the circuit court of Du Page County is reversed.

Reversed.

NASH and UNVERZAGT, JJ., concur.

APPENDIX A

Master Site Plan
Urban Investment & Development Co.

Stratford
Bloomingdale, Illinois

# Appendix B

SITE PLAN - LANDSCAPE

SITE DATA