ROGER J. SMITH *et al.*, Plaintiffs-Appellants, v. HAROLD A. DUNCAN *et al.*, Defendants-Appellees.

Fifth District   No. 5—91—0377

Opinion filed June 22, 1992.

Barry Schaefer, of Newton, for appellants.

Max L. Tedford, of Cox, Phillips, Weber, Tedford & Heap, P.C., of Robinson, for appellees.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiffs, Roger J. Smith and Trisha Weger, the operators of an oil and gas lease upon land in Crawford County owned by defendants, Harold A. Duncan and Helen Duncan, filed suit to enjoin defendants from interfering with their operation of the leasehold. Defendants counterclaimed, attempting to cancel plaintiffs' lease on the ground that it terminated due to nonproduction. Following a hearing on the complaint and countercomplaint, the circuit court held in favor of defendants on the countercomplaint, canceling the oil and gas lease, and denied plaintiffs' complaint for injunction. Plaintiffs appeal only that portion of the circuit court's order granting defendants' counter-complaint.

Defendants executed an oil and gas lease to plaintiffs on October 23, 1987, which provided for a one-year primary term and for a secondary term which would continue "as long thereafter" as oil or gas was produced from said land by the lessee. Plaintiffs' last shipment of oil during the primary term occurred September 8, 1988. Plaintiffs shipped only one tank of oil during 1989, that occurring on October 11, after which date no oil was shipped prior to plaintiffs' filing suit on July 3, 1990.

The leading case in Illinois on the termination of an oil and gas lease under its "thereafter" or habendum clause is *Gillespie v. Wagoner* (1963), 28 Ill. 2d 217, 190 N.E.2d 765. There, as in the case at bar, the basic question presented was whether cessation of production after the expiration of the primary term terminated the lease. The Illinois Supreme Court in *Gillespie* reasoned as follows:

"The general rule has been stated in the following language: 'If the lessee by producing oil or gas within or at the end of the definite term, has satisfied the contingency upon which the lease is to continue beyond that term, it is the plain intent of the "thereafter" clause that the lease shall continue as long as oil or gas continues to be produced in paying quantities. From this it is clearly inferred that if production ceases the lease is

at an end, although a temporary cessation of production does not terminate the lease under this limitation.' 2 Summers, Oil and Gas, sec. 305.

* * *

We believe the proper rule to be that temporary cessation of production after the expiration of the primary term is not a cessation of production within the contemplation and meaning of the 'thereafter' clause if, in the light of all surrounding circumstances, reasonable diligence is being exercised by the lessee to continue production of oil or gas under the lease." (28 Ill. 2d at 219-20, 190 N.E.2d at 766-67.)

The record reflects that the circuit court granted defendants' counter-complaint to cancel the lease "due to cessation of production and lack of diligence." The issue on review, therefore, is whether this finding was against the manifest weight of the evidence. See *Cosmopolitan National Bank v. County of Cook* (1984), 103 Ill. 2d 302, 318, 469 N.E.2d 183, 191.

Plaintiff Roger Smith testified at the hearing that after some initial trouble with the motor on the well had been fixed in 1988, the motor ran well for the rest of the year. After the last shipment of oil in September 1988, plaintiffs next attempted to resume production toward the end of April 1989, as Smith stated, "[i]n the spring as soon as the road was unposted and the road dried, and we could get into Mr. Duncan's barnyard and load the trucks." Smith stated that defendants had requested he not enter the property during the winter when the roads were wet. Smith further testified that he was told "not to put a rock road in because it would bother the cattle's feet and I tried to get along, and I didn't try to build a road into it."

Smith stated that he had shipped oil only once in 1989 because "we had a lot of trouble with the motor." Smith further testified:

"Every time we'd go in and get it [the motor] running and start trying to pump the water on the well down, you know it takes a few days to pump the water down on the well. Well, we'd have trouble. Someone would shut the motor on the well off. Then we'd start all over. We'd come back and start it up the next time and then try to keep it running. We had great difficulty in trying to keep it running a day or two at a time. Someone would keep shutting the gas lines off on it."

Throughout the rest of 1989, Smith tried to pump out the water and start the well in production but, "every couple of days someone would bother the motor and shut it off." Smith explained:

"It takes two or three days to get the water pumped down on the well before it starts making oil, and if you lose—if you pump it for two or three days, and if you shut that down and lose that, you have to start that two or three day period over. We were just bothered all that year, and it took that long to accumulate that tank of oil."

Smith testified that he encountered similar problems in 1990: "They unposted the roads at the end of April when the spring rains dry [sic] up the road enough to get in on the ground with the truck, and I tried to operate it. And the same thing—someone bothered the motor just regularly." Smith testified that sometime in August 1990, he had just overhauled the motor and made it operational, but that when he next returned, the gate was padlocked and defendant Harold Duncan told him that he was not going to let Smith on the leasehold again. Smith stated that he then told Duncan, "Well, we figured someone had been shutting the gas off to the motor, the trouble we had been having," and that Duncan said, "Yeah, if you start it again, you won't run it, I won't let you." Smith admitted that he had never seen Duncan shut the motor off.

One of plaintiffs' employees, Richard Walters, testified that he had helped Smith overhaul the motor. Walters testified that when they returned the next day, they could see from the road that the motor on the well was off and when they approached the gate, it was padlocked. Walters testified that Smith asked Duncan if he had been the one shutting the motor off, and Duncan replied, "Yes, I've been shutting it off, what about it?" Smith then replied, "Yes, I guess I'll have to see you in court." Todd Smith, plaintiff's son, and several employees of Bi-Petro Oil testified to having been harassed by Duncan while servicing the well on various occasions in 1988 and 1989.

Defendant Harold Duncan denied that he had ever interfered with plaintiffs' motor prior to 1990. Duncan admitted that in 1990 he shut the motor off and locked the gate, denying plaintiffs access to the property. Defendant Helen Duncan, Harold Duncan's wife, testified that although she and her husband had run electric lines to the lease during its primary term so that plaintiffs could install an electric motor, plaintiffs had never done so. Mrs. Duncan further testified that from October 1988 to October 1989, she had not seen plaintiffs on her property.

■ Plaintiffs argue that the record in this case shows reasonable diligence in their operation of the lease, even though only one tank of oil was shipped after the primary term expired. Plaintiffs contend that the failure to produce commercial quantities of oil was beyond

their control, where the uncontroverted evidence showed that they suffered continual problems with the well machinery. We agree.

In *Kerr v. Hillenberg* (Okla. 1962), 373 P.2d 66, the Oklahoma Supreme Court held that an oil and gas lease did not terminate where production ceased for 12 months due to the fact that the engine providing power for the operation of the wells broke down and lessee made persistent good-faith efforts to obtain the parts necessary for repair. Similarly here, plaintiffs made repeated efforts throughout 1989 and 1990 to keep the motor on the well running so that production could continue. Additionally, neither plaintiffs' acquiescence to defendants' request that a rock road not be built nor any failure to install an electric motor on the well can be said to prove lack of diligence without evidence that such "improvements" were feasible or practical. See *Feland v. Placid Oil Co.* (N.D. 1969), 171 N.W.2d 829 (after oil well was shut down following filling of salt water disposal pit, operator-lessee's failure to construct a second pit did not amount to a violation of its obligation to use reasonable diligence and act in good faith where other circumstances made construction of additional pit unprofitable).

We believe that the record herein amply demonstrates that there was a temporary cessation of oil production and the lease did not terminate. Rather, "in the light of all surrounding circumstances," reasonable diligence was exercised by plaintiffs to continue production under the lease. (*Gillespie*, 28 Ill. 2d at 220, 190 N.E.2d at 767.) We therefore hold that the findings of the trial court and conclusions of law based thereon are not sustained by the evidence or the law. Consequently, the judgment of the circuit court granting defendants' counterclaim and cancelling plaintiffs' lease is reversed.

Reversed.

GOLDENHERSH, P.J., and RARICK, J., concur.