HERBERT EUGENE DART *et al.*, Plaintiffs-Appellees, v. STANLEY LEAVELL *et al.*, Defendants-Appellants (Betty Dunlap *et al.*, Defendants).

Fifth District   No. 5—02—0441

Opinion filed June 11, 2003.—Motion to publish granted July 25, 2003.

Christopher Heid, of Carmi, for appellants.

Frank J. Weber, of Cox, Phillips, Weber, Tedford & Heap, P.C., of Robinson, for appellees.

JUSTICE MAAG delivered the opinion of the court:

The plaintiffs, Herbert Eugene Dart and Mary Jane Dart, filed an action to cancel an oil and gas lease granted to the defendants, Stanley Leavell and Eva Lovene Leavell, alleging that the lease had been forfeited due to nonproduction and inoperable equipment. Following a bench trial, the circuit court of Crawford County entered a judgment for the plaintiffs. The court found that the lease had terminated due to nonproduction and that the defendants had not exercised due diligence in producing and marketing product from the lease. On appeal, the defendants claim that the court's decision was against the manifest weight of the evidence.

The following evidence was adduced at the trial. The plaintiffs acquired a 40-acre tract of land in Crawford County, Illinois, in May 1964. They have resided in a house on the southeast corner of the property since that time. In 1983, the plaintiffs entered into an oil and gas lease with a company affiliated with the Leavell family. The defendants, also members of the Leavell family, obtained ownership of

the lease in 1996. Under the terms of the lease, the defendants had the right to prospect, drill, and produce oil on the 40-acre tract. Four production wells and an injection well, all powered by electricity, were drilled on the property. The wells are surrounded by fields that the plaintiffs farm. There are unimproved roads throughout the farm fields that lead to the wells.

Herbert Dart testified that the wells were productive from 1983 through the mid-1990s and that he and his wife received royalty checks regularly during that period. Dart stated that production began to fall off about the time the defendants obtained the lease. He testified that they received two royalty checks in 1997 and one in April 1998. He stated that the April 1998 payment was for oil produced in March 1998. Dart testified that he did not see any of the wells pumping after March 1998. He presented pictures he had taken in September 1999, around the time that this suit was filed, showing that vegetation had grown up around the wells. He said that he did not know whether any of the wells were functional at that time because they had been shut down for 18 months. Dart testified that he farmed the ground sur-rounding the wells. Each spring, he disced and planted through the access roads on the property. He stated that discing smoothed the ruts and made the roads passable. Dart stated that the defendants had never complained about the road conditions and that they continued to use the lease roads after the discing work. Dart admitted that he put up "no trespass" signs and a barricade near two of the lease roads at the time the lawsuit was filed. He also admitted that during the leasehold period he made complaints to the Illinois Office of Mines and Minerals of the Department of Natural Resources (Office of Mines) about the defendants' lack of maintenance of some of the wells.

Rhonda Huddleston, an accounts supervisor at the Norris Electric Cooperative, testified in the plaintiffs' case. Huddleston testified that her company supplied electricity for the wells. She testified that she had reviewed monthly records regarding the electricity used to operate the wells and the cost of that usage. Her records showed that from April 1998 through December 1998, the defendants were charged $25 in each monthly billing period. The records reflected a minimal usage of 200 to 250 kilowatt hours per month. She compared the electricity used during this period to that used during the first three months of 1998. During the first part of 1998, the usage resulted in charges of more than $300 per month. She also noted that with the exception of a 30-day period from December 17, 1998, through January 18, 1999, the records reflected minimum usage throughout 1999. During that December-January period, the defendants were charged $61.91, and 180 kilowatt hours were used. Huddleston stated that an operating

pump jack would use more than the minimum amount of electricity during a one-month period. She explained that she could not state whether the minimum amount of electricity would be sufficient to operate a well pump for one week because the watt usage depends on the horsepower of the motor. She testified that the defendants' service was cut for nonpayment in July 1999.

Stanley Leavell testified that he did not abandon the wells and that he engaged in activities directed toward oil production on the wells from April 1998 through the date the lawsuit was filed. Leavell testified that he had expenditures for operations of the wells in 1998 and 1999. He did not produce records documenting the expenditures. Leavell also stated that he paid the well fees and the property taxes during this period. Leavell admitted that he did not pay the electric bill in July 1999. He stated that he did not pay the bill because he intended to install a new pump house and he wanted to be sure that the electricity to the wells would be cut off. Leavell testified that oil production suffered because oil prices were depressed in 1998 and 1999.

Leavell testified that the wells on the Dart property produced about 3.5 barrels a day. He admitted that he did not keep a daily gauge or any other record of the quantity of oil produced by any of the wells on the lease. Leavell testified that he sold oil on March 5 and March 10, 1998. After that oil was sold, his reserve tank was empty. He stated that there is a residual amount of oil that is not removed from the tank. Leavell stated that he ran the wells from March 10, 1998, through April 20, 1998. He did not have any record of the quantity of oil produced during this period. Leavell also stated that he ran one well in December 1998. He stated that he turned that well on, ran it for a few days, and then turned it off. Again, he had no record of the quantity of oil produced during this period. He said that he did not run the well throughout January 1999 because he was concerned that the well might freeze due to the very cold temperatures. Leavell testified that he sold 72.65 barrels of oil in August 1999. He stated that the lease had produced approximately 72.65 barrels between March 1998 and December 1998 because he sold all of his reserves in March 1998. Leavell stated that the oil produced in December 1998 was a part of the 72.65 barrels sold in August 1999, but he could not identify what portion was produced in April 1998 and what portion was produced in December 1998.

The plaintiffs filed a complaint to cancel the lease in September 1999. In the complaint, the plaintiffs allege that "no production of oil has been obtained from said leases" since about March 1998, that subsequent to that time the equipment has become inoperable, and

that by the express terms of the leases, the leases have been forfeited and are of no further force and effect. In their answer, the defendants denied that they abandoned the leases and alleged that the plaintiffs had interfered with their access to the wells by planting on the lease roads, by placing "no trespass" signs on the property, and by filing complaints with the Office of Mines.

The trial court found that the plaintiffs had presented a *prima facie* case of abandonment and cancellation, based upon evidence that no royalties had been received since April 1998, that no production-related activities had occurred on the plaintiffs' property for a considerable length of time, that the electrical service had been disconnected in July of 1999, that the electrical bills showed only minimal billings for most months since April 1998, and that there was a great growth of vegetation in and around the well sites, giving the appearance that the well sites had been abandoned and forgotten.

The trial court also determined that the grounds offered by the defendants for the lack of production did not constitute matters beyond their control and that the defendants failed to show reasonable diligence to continue production under the lease. More specifically, the court determined that the lease had lapsed due to nonproduction before the "no trespass" signs and barricades were placed and that this action did not account for the lack of production prior to August 1999. The court found that with the exception of the period from December 1998 to January 1999, when there was slightly more than minimum usage, there was no evidence that the wells were producing from April 1998 through July 1999, when the electric service was cut off. The court concluded that oil sold in August 1999 had been actually produced and stored months prior to the sale and that by the time the oil was sold, the lease had already lapsed through nonproduction. The court rejected the defendants' claim that they were diverted from production activities while they were responding to complaints filed with the Office of Mines. The court noted that the complaints involved matters of production which were under the control of the defendants and further that they were not shown to lack merit. Finally, the court found that the discing of the roads had not blocked the defendants' access to the wells. The court determined that though the defendants could have accessed the roads as they had in prior years or, alternatively, confronted the plaintiffs, they chose to do nothing. Based upon the evidence, the court ruled that the plaintiffs were entitled to a cancellation of the lease.

In this case, the plaintiffs alleged that the defendants had not produced any oil from the wells in the 18-month period immediately preceding the filing of the complaint. In support of their prayer to

cancel the lease, the plaintiffs rely on the habendum clause in the lease. The habendum clause provides that the lease "shall remain in force for a period of six months from this date (called 'primary term') and as long thereafter as oil, liquid hydrocarbons, gas or their respective constituent products, or any of them is produced" from the leasehold. The plaintiffs argue that the period of nonproduction was of sufficient duration to warrant a declaration that the lease was at an end.

■ Whether the lease was "producing" was a question of fact for the trial court. *Pieszchalski v. Oslager*, 128 Ill. App. 3d 437, 448, 470 N.E.2d 1083, 1090 (1984). An oil and gas lease may be abandoned by the cessation of operations for an unreasonable length of time. *Spies v. De Mayo*, 396 Ill. 255, 274, 72 N.E.2d 316, 325 (1947). The long-standing rule is that "temporary cessation of production after the expiration of the primary term is not a cessation of production within the contemplation and meaning of the 'thereafter' clause if, in the light of all surrounding circumstances, reasonable diligence is being exercised by the lessee to continue production of oil or gas under the lease." *Gillespie v. Wagoner*, 28 Ill. 2d 217, 220, 190 N.E.2d 765, 767 (1963).

■ In this case, the evidence in the record supports a finding that the lease terminated due to nonproduction. According to the records of the oil sales, the defendants produced only 73 barrels of oil in the period from April 1998 through September 1999. Stanley Leavell testified that he ran one well for a few days in December 1998. He stated that some oil was produced during that brief period, but he could not identify how much was produced. There is no other evidence indicating the quantity of oil, if any, that was produced in December 1998. The electric company records show a only slight increase in watt usage during this period. The recorded wattage is far less than the amount used during the periods when the wells were operating in 1998 or 1997. Based upon the electric company records, it is reasonable to infer that most of this oil was produced prior to April 20, 1998. There is no evidence in the record to show that the wells were operated or that any oil was produced after December 1998. In addition, the defendants did not present bills, receipts, or other documents to support their claim that they had been engaged in preproduction preparation and maintenance activities in 1999. As of September 1999, at the time this lawsuit was filed, there was no evidence that a restoration of production was imminent. The plaintiffs did not receive a royalty check after April 1998. Based upon the record, we conclude that the trial court's finding that the lease terminated under its own terms for nonproduction was supported by the evidence. See *Pieszchalski*, 128 Ill. App. 3d at 447, 470 N.E.2d at 1090.

The evidence does not support the defendants' contentions that they exercised reasonable diligence to continue to produce oil under the lease. The evidence shows that the defendants did not run any of the oil wells after December 1998. This is not a case where an interruption in production occurred because of a mechanical breakdown, vandalism, or some other problem beyond the control of the operator. See, *e.g., Smith v. Duncan*, 230 Ill. App. 3d 164, 595 N.E.2d 645 (1992). One of the reasons offered for the defendants' failure to run the pumps and to produce oil was the depressed price of oil. Though a depressed market may have rendered it unprofitable to operate the lease, it did not prevent the operation of the wells. We have reviewed the lease and have found no provision excusing production and marketing in the event that the oil market becomes depressed. The depressed price of oil was not contracted against. Consequently, it cannot be used to justify nonproduction, and it does not prevent a lapse of the lease where production has been shut down.

The trial court also considered and rejected the defendants' claims that the plaintiffs interfered with their ability to tend to the wells. There was conflicting testimony regarding when "no trespass" signs had been placed near the lease roads and whether discing prevented the defendants from using the lease roads. The trial court apparently accepted Herbert Dart's testimony that the signs had been placed at the time the lawsuit was filed and that the discing had never before prevented the defendants from using the lease roads in order to tend to the wells. In a bench trial, the trial court, as the fact finder, is in a superior position to assess credibility and resolve conflicts in the testimony, and we will not second-guess the trial court on those issues absent a finding that its decision was against the manifest weight of the evidence. See *Powers v. Bridgeport Oil Co.*, 238 Ill. 397, 401, 87 N.E. 381 (1909); *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 433, 581 N.E.2d 656, 660 (1991). The trial court properly rejected the defendants' claim that their attention to production was diverted due to the complaints filed with the Office of Mines. This is not a case where the issue involved the validity of the lease. See, *e.g., Maschhoff v. Klockenkemper*, 317 Ill. App. 3d 554, 740 N.E.2d 830 (2000). According to the record, the subject of the complaints involved safety and production issues. The defendants have not shown that the complaints were unfounded or were so numerous that they interfered with ongoing operations of the lease and constituted harassment.

There is sufficient evidence in the record to support the trial court's findings that the cessation of production was not temporary and that the lease terminated under the terms of the habendum clause, and its decision is not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

GOLDENHERSH and DONOVAN, JJ., concur.